RICHARD S. GILMORE, trustee, *vs.* CENTURY BANK AND TRUST
COMPANY.

Middlesex.  January 9, 1985. — May 15, 1985.

Present: BROWN, KAPLAN, & SMITH, JJ.

*Contract*, Performance and breach, Building contract, What constitutes,
Parties.

In an action by a trustee for contractors on a construction project against a
mortgagee bank which had entered into an agreement with the owner
to ensure continuation of work on the project after it had been halted
for lack of funds, there was evidence to support the judge's findings
that the bank had breached its agreement with the owner, that the resulting
money shortage prevented completion of the project, and that the subcon-
tractors suffered damages of $180,000 as a result. [53-55]
Where a bank holding a construction mortgage on a project entered into an
agreement with the owner to ensure continuation of work on the project
after it had been halted for lack of funds, where continuation of the
project required the cooperation of contractor-creditors, and where the
owner, as contemplated by its agreement with the bank, entered into an
agreement with contractors on the project and a trustee for the contractors
providing that the contractors would release mechanics' liens, forbear
suit, return to work, and accept a plan for deferred payment, the trustee
was entitled to bring an action against the bank for breach of contract,
despite the bank's claim that the trustee was not a party to the agreement
with the bank. [55-58]

CIVIL ACTION commenced in the Superior Court Department
on May 6, 1982.

The case was heard by *Andrew R. Linscott,* J.

*Patrick F. Brady* for the defendant.

*Stephen D. Walsh* for the plaintiff.

KAPLAN, J.  Defendant Century Bank and Trust Company
appeals from a judgment of the Superior Court awarding dam-
ages for breach of contract to the plaintiff, trustee for subcon-
tractor-creditors. The trustee cross appeals from the judge's

refusal to increase the interest award on the judgment or to find for the trustee on additional theories of recovery. We accept that the judge's findings, after trial without a jury, are supported by the detailed record and are not "clearly erroneous." Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). In that view we affirm the judgment, rejecting both the appeal and cross appeal (see note 11, *infra*). Upon the findings, elaborated only as far as necessary by references to the record evidence, the case stands thus.

1. *Breakdown of condominium construction project.* In 1980, Grant-Morgan, Ltd., a company owned in equal shares by Conal C. Doyle and George Cuker, acquired an abandoned brick warehouse on Richdale Avenue, Cambridge,[1] with the purpose of reconstructing it in the form of sixteen units suitable for sale as condominiums. In July, 1980, Century Bank and Trust Company (Century) made a construction loan to Grant-Morgan of $800,000 with interest at 17%, secured by a first mortgage on the property,[2] and guaranteed personally by Doyle, Cuker, and Cuker's wife Rita. Construction had begun about April, 1980, with Grant-Morgan using Kent Corporation, owned by Cuker, as manager, to deal with and make payments to subcontractors.[3] In fall, 1980, it appeared that the $800,000 would not suffice. Century in November in effect enlarged the loan by $200,000 upon the same security and with the same guarantors.

Around December, 1980-January, 1981, the loan money was exhausted, work was halted some twenty percent short of completion, and subcontractors were unpaid in an amount over $300,000. In the few months following, several unpaid subcontractors filed mechanics' liens on the property. Moreover, fric-

---

[1] The property was purchased by a real estate trust benefically owned by Doyle and Cuker and was transferred to Grant-Morgan.

[2] An existing purchase money mortgage of $125,000 on the property, held by the Dorothy Kearsley Trust, was subordinated to Century's mortgage. See note 6, *infra*.

[3] The term "subcontractor" is used throughout although, in strictness, Kent may not have figured as a general or prime contractor. (Cuker also acted through another company called "Team.")

tion had developed between Doyle and Cuker; Doyle charged that Cuker had "skimmed" money from the Richdale enterprise for his own purposes. With the mortgage loan in default, Century, consulting with Doyle and Cuker and some subcontractors, prepared a number of variant rescue plans for the project. The plan finally arrived at, described below, could succeed only if the subcontractors were brought into it in a body. Century evidently reviewed a circular letter of information and solicitation sent by Grant-Morgan to the subcontractors. Doyle kept Century posted as to the names and numbers of subcontractors willing to give their assent or remaining hesitant. In some cases Doyle referred subcontractors to Century (especially to a senior vice president, Martin Daley) for information and persuasion, and Century advised these subcontractors as well as others who made inquiries direct. At times Century counseled Doyle on the tactics to be used with reluctant subcontractors: they might be reminded that Century could foreclose; perhaps a particular convinced subcontractor should be asked to talk to one who still doubted.

2. *Rescue agreements.* The final plan was embodied in two documents, both dated April 8, 1981.[4] The first, referred to as the "workout" agreement, was drafted by Century and signed by Century, Grant-Morgan, and the three individuals. Century undertook to add $250,000 to the mortgage loan (the personal guaranties being extended accordingly)[5] in order to assist in completing the project. From the $250,000 advance, however, $75,000 would be deducted by Century for interest due to it, and a further $3,000 deducted to cover legal fees, leaving a balance of $172,000 for working purposes. The interest rate on the entire loan, now to be in the principal amount of $1,250,000, was increased to prime rate plus 3%, with a "floor" of 17%. As a condition of the advance, the forty-two subcontractors with accrued claims for work already done, amounting in the aggregate to more than $330,000, must assent to a trust mortgage of junior rank in which their claims would be con-

---

[4] A preliminary letter of "commitment" regarding the new $250,000 loan had been sent by Century to Grant-Morgan in February, 1981.

[5] See also note 8, *infra.*

solidated.[6] The project was to be completed, the loan progressively paid, and the accrued claims of subcontractors deferred but finally liquidated, as follows.

Century was to receive $90,000 principal plus interest from each of the first thirteen units sold, and $80,000 plus interest from the fourteenth. The balances from the sales of the first six units, expected to amount to $165,000, together with the net of $172,000 from Century's advance, a total of $337,000, would be used to complete the construction, with the subcontractors being paid for their current work. From the proceeds of the seventh through the fourteenth sale, the subcontractors, through their trustee, were to receive as much as $23,000 per unit in liquidation of their accrued claims; from the fifteenth sale, $40,000; and from the sixteenth, all the net proceeds. If a shortfall should occur in the funds needed to complete the project, Cuker was undertaking to contribute up to $225,000, as to which, the agreement stated, he had already given mortgages on two of his houses as collateral; in respect to this obligation, the agreement further stated, Cuker was already furnishing $25,000.

David Dionne was to supervise the project as agent for Grant-Morgan but Century, represented by Daley, was to have the right of ultimate decision. Century must approve the sale prices of the condominium units. Daley, for Century, was to make all decisions as to distribution of the funds whether applied to the Century loan or to the subcontractors' claims; and no funds were to be allocated toward the subcontractors' accrued claims until the then accrued interest, principal, and expenses due Century on its loan had been paid. Signatures of both Daley and the trustee were required for disbursements from the trustee's account.

---

[6] The Kearsley mortgage had to be and was made junior to the whole Century loan; by banking regulations, according to Century, the mortgage securing the bank's loan had to be a first mortgage. The mechanics' liens had to be lifted for the same reason. In effect, the trust mortgage was a third mortgage.

It was a part of the workout agreement that the Kearsley indebtedness and mortgage would be extinguished in exchange for one of the condominium units, and that transaction in fact occurred at a later date.

The second instrument was entitled "Trust Indenture" and was signed by Grant-Morgan, the trustee named in the instrument (he had been named as the trustee in the workout agreement), and each of the assenting subcontractors. Century had furnished a model agreement for the drafting of the indenture. The subcontractor-creditors agreed with Grant-Morgan that, as long as the latter carried out its obligations under the indenture, they would forbear prosecution of their existing claims, and those with mechanics' liens would release them. The obligations of Grant-Morgan comprised payment of the $23,000 per unit, and so forth, on the terms set forth in the workout agreement as outlined above. There was provision for the trustee's junior mortgage, and also for distribution of funds by the trustee pro rata (with a certain exception) among the subcontractors.

3. *Breach.* Money was not actually forthcoming to the project from Century out of its advance until April 30, 1981. Mechanics' liens were released, the subcontractors went back to work, and they were paid for their current work. It was essential to the plan that construction proceed rapidly to completion. In fact, the work ceased in mid-June, again for lack of funds, and did not resume until August. There were three violations by Century of the workout agreement, as the judge correctly found. Century did not make available $172,000 of the $250,000 loan. It had deducted perhaps $120,975, instead of $78,000.[7] Despite

---

[7] Any doubt about the exact amount does not affect the substance of the breach. It is indicated that Century at first deducted $125,975 of which $101,940 consisted of interest to April 30, 1981, calculated at prime plus 3%. Later an adjustment of $5,000 seems to have been made in another item, bringing the deduction to $120,975. Thus the money released would come to $129,025 rather than the promised $172,000.

Century states that Doyle and Cuker agreed to the deduction, but it would be a shotgun concession by them at best, as Doyle pointed out. So also, if the subcontractors were third-party beneficiaries entitled to sue, the concession to Century, without their knowledge or consent, would violate their rights, which had become fixed by reason of their reliance. See point 4, *infra,* and Restatement (Second) of Contracts § 311(3) comments g & i (1981).

Century's favoring itself by deducting more than was agreed is reminiscent of the defendant bank's behavior in *Superior Glass Co.* v. *First Bristol County Natl. Bank,* 380 Mass. 829 (1980), *S.C.,* 8 Mass. App. Ct. 356 (1979).

Century's representation, Cuker had not furnished the $25,000 against his $225,000 contingent obligation. The further representation, that Cuker had furnished collateral for this entire obligation, also proved false; and when in May, 1981, Cuker was called upon to provide $45,000 of the $225,000, he did not respond.[8]

Dionne, the "project coordinator," called as a witness by the plaintiff trustee, testified that the shortage of money, coming about as we have noted, wrecked his "Phase I" program to complete the construction. June was the busiest season for the subcontractors; having gone off the job at that time, they could not be readily reassembled. The result was delay in marketing the condominium units. Dionne said, "Timing was everything." In the Cambridge community the usual pattern was: sales activity in May-June, closings July-August, for occupancy in September. Here the condition of the construction hampered the promotion of sales and depressed the money returns. It is true that there was another dampening condition: the market in Cambridge was deteriorating at the particular time as interest rates rose on borrowings by purchasers of condominiums. Yet the money shortage in its effect on the completion of construction could fairly be found to be very material in causing loss to the subcontractors.

By late 1981 the project passed to Century as mortgagee in possession, and foreclosure followed.[9] At this point ten units had been sold. The subcontractors had received only $69,000

---

[8] To be distinguished is the collateral furnished by Rita Cuker at the time of the third Century advance to secure her guaranty of the entire Century loan. It consisted of mortgages on two houses of which she alone was the record owner. What the workout agreement represented was that George Cuker would provide collateral to secure his own, separate undertaking to provide up to $225,000 in case of shortfall. Century says that the mortgages on the two houses were intended to be the collateral for George's obligation as well as Rita's, but that would not be apparent to a subcontractor reading the workout agreement. In fact there was testimony by subcontractors that they placed reliance on the supposedly collateralized $225,000 arrangement with Cuker.

[9] Completion of the foreclosure was enjoined temporarily on application of the trustee in the present action. By agreement the injunction was dissolved at the commencement of trial.

through their trustee on account of their accrued claims.[10] The amount of the subcontractors' just recovery was figured by calculating what the subcontractors probably would have received, had the provision of funds not been diminished and slowed by reason of the contract breaches. The construction program would then have been carried out more or less as contemplated, and it was feasible on that assumption to estimate when and at what prices the units would have been sold, and how the agreed division of proceeds between Century and the trustee would have come out. Testimony on this matter was given by Dionne; it was supported by the testimony of Fred Meyer, an experienced Cambridge real estate broker, who was in fact called as a witness by the defendant Century. The subcontractors' loss could be fairly estimated as $180,000, and judgment entered for that amount. The judge said in his findings, "These damages are not speculative. They are ascertainable." We agree.[11] A party standing in breach cannot insist on mathematical precision in the measurement of damages, and may expect some lack of sympathy when he claims that the loss would have been suffered even if breach had not occurred.

4. *Trustee's right to sue.* Apart from quarreling with the facts as found and with their characterizations by the judge, Century contends that the trustee may not recover for breach of the workout agreement because he was not a party to it, having executed only the trust mortgage. The argument fails for any and all of three reasons.

---

[10] By reason of sundry payments to the subcontractors, which need not be dealt with here, the amount owing to them by the time of trial was reduced to $255,490. (By evident mistake the findings relate this figure to April 8, 1981.)

[11] The judgment allowed interest from the date of the commencement of the action. By a motion to amend judgment, the trustee claimed interest from April 8, 1981, the date of the workout agreement and trust mortgage, and the point is pressed by cross appeal. We think the judge was right, as the exact date or dates of breach were not specifically determinable. Cross appeal was also taken from the dismissal of counts for "breach of fiduciary duty" and "unfair and deceptive trade practices" prohibited by G. L. c. 93A, §§ 2 & 11. The judge held that only breach of contract had been proved; that the breach did not "rise[ ] to the level of a violation of G. L. c. 93A." There was no error.

(a) There are expressions in the cases about when instruments deriving from a given transaction shall be read together. We find mention of such factors as simultaneity of execution, identity of subject matter and parties, cross referencing, and interdependency of provisions. See, e.g., *Chelsea Indus. Inc.* v. *Florence,* 358 Mass. 50, 55 (1970). By these indicators the two documents at bar can well qualify for integrated reading, as if they were combined in a single paper bearing all signatures. This graphic view invites the conclusion that the trustee may enforce Century's obligations which were of benefit to the subcontractors whom he represents. However, we need not and perhaps should not count merely on the formal factors that connect the two agreements. Rather we lay stress on the sense of the thing and endorse the judge's remarks: "For these instruments to make any real sense, they must be read together and interpreted as one contract. This was the intent of the parties at the time." He concluded: "I find and rule that exhibits 21 [workout] and 22 [trust mortgage] are one binding contract *and* that plaintiff and defendant are parties to this contract and bound by it" (emphasis in original).

(b) Aside from the effect of this merger of the agreements into a unitary contract, the trustee on behalf of the subcontractors had a right to enforce Century's undertakings in the workout agreement as a third-party beneficiary of it. Century had sunk considerable sums into Grant-Morgan and the latter was heavily indebted to the subcontractors. Century and Grant-Morgan were trying to save themselves by salvaging the situation. The joinder of the subcontractors was indispensable to any hope of success; in recognition whereof Century not only took a hand in enlisting the cooperation of the subcontractors, but also sought by the terms of the workout agreement (replicated in the trust mortgage) to provide in detail for the liquidation of their accrued claims. Century went further and appointed itself paymaster for direct distribution of funds to the trustee on behalf of the subcontractors. In this setting, the implication of a right of action in the trustee against Century, in case of breach, seems clear enough. The trustee was a "creditor beneficiary" (in the older terminology) entitled to sue — perhaps

more obviously such than the plaintiff law firm in *Choate, Hall & Stewart* v. *SCA Servs., Inc.*, 378 Mass. 535, 542-548 (1979). According to the systematics of the Restatement (Second) of Contracts § 302 (1981), to which our courts subscribe, see *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 195 (1982), the trustee was an "intended" beneficiary because "recognition of a right to performance in the [trustee] is appropriate to effectuate the intention of the parties and . . . the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary." § 302(1)(a).[12] "In such cases," says comment b, "the promisee is surety for the promisor, the promise is an asset of the promisee, and a direct action by beneficiary against promisor is normally appropriate to carry out the intention of promisor and promisee, even though no intention is manifested to give the beneficiary the benefit of the promised performance."

That the subcontractors relied on Century's undertakings of course fortified their trustee's right to sue under § 302(1)(a). This reliance had additional significance, as indicated below.

(c) The trustee was an "intended beneficiary" in another sense, that of § 302(1)(b), as "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." (See full text of § 302, at note 12, *supra*.) Comment d offers as examples cases where "the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." On the present record, the subcontractors in fact relied, and with

---

[12] Section 302 reads thus:

"Intended and Incidental Beneficiaries

"(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

"(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary."

reason, by releasing mechanics' liens, forbearing suit, returning to work, and accepting the plan for deferred payment. For the recognition of such reliance, see *Rae* v. *Air-Speed, Inc.,* 386 Mass. at 195 n.3 (1982) (citing § 302 comment d); *Pstragowski* v. *Metropolitan Life Ins. Co.,* 553 F.2d 1, 5 (1st Cir. 1977); *Commercial Ins. Co.* v. *Pacific-Peru Constr. Corp.,* 558 F.2d 948, 953-954 (9th Cir. 1977); *Beverly* v. *Macy,* 702 F.2d 931, 938-942 (11th Cir. 1983) (2-1 decision). See also § 302, illustrations 11 & 12; Farnsworth, Contracts § 10.3, at 725 (1982).

Century is mistaken in the view it takes of the legal situation. It says that the legal relations in construction loans are understood to be solely between the lender-bank and the borrower-owner, and a breach of the loan agreement by the lender, say by late payment to the owner or other default, may not be sued on by a prime or subcontractor on the job (apart from statutory change). That may make sense in the usual construction set-up: that a flow of funds to the borrower may be of benefit to those engaged in work at the site may not in itself vest the latter with claims against the lender. See 4 Corbin, Contracts § 779D, at 43 (1951). Cf. *First Hartford Realty Corp.* v. *Corporate Property Investors,* 12 Mass. App. Ct. 911, 912 (1981). The present case is not the usual one. Here there was a calamitous breakdown of the usual arrangements. Calamity is a great leveler, as the saying goes, and to meet the crisis all the affected parties had to get together in a spirit of cooperation, and from the cooperation arose interdependencies signified by reciprocal rights and duties. Such was the background that provided the rationale of the present judgment.

*Judgment affirmed.*