**PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE,**
Debtor, Appellee,

v.

**HUDSON LIGHT AND POWER DE-PARTMENT** and Peabody Municipal Light Plant, Defendants, Appellants.

**PUBLIC SERVICE CO. OF NEW HAMPSHIRE,** Debtor, Appellee,

v.

**HUDSON LIGHT AND POWER DEPARTMENT, et al.,**
Defendants, Appellees,

West Boylston Municipal Light Plant, Defendant, Appellant.

**PUBLIC SERVICE CO. OF NEW HAMPSHIRE,** Debtor, Appellant,

v.

**HUDSON LIGHT AND POWER DEPARTMENT, et al.,**
Defendants, Appellees.

Nos. 91–1147 to 91–1149.

United States Court of Appeals, First Circuit.

Heard March 7, 1991.

July 17, 1991.

claims against Public Service Company of New Hampshire ("PSNH") as alleged intended beneficiaries under certain agreements between PSNH and the Massachusetts Municipal Wholesale Electric Company ("MMWEC"), a Massachusetts public corporation authorized to secure sources of electric power for sale to various utilities.[1] We affirm.

Peter B. McGlynn, with whom Owen R. O'Neill and Rosen, Crosson, McGlynn, & Resnek, were on brief, for defendants, appellants Hudson Light and Power Dept., et al.

Alan K. Posner, with whom Mark W. Corner and Rubin and Rudman, were on brief, for defendant, appellant West Boylston Mun. Light Plant.

Allan B. Taylor, with whom John B. Nolan, Day, Berry & Howard, Warren C. Nighswander, John R. Harrington, William D. Randolph, Sulloway, Hollis & Soden, Geoffrey M. Kalmus, Kramer, Levin, Nessen, Kamin & Frankel, Howard Berman and Whitman & Ransom, were on brief, for appellees.

Before CAMPBELL, and CYR, Circuit Judges, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Appellants are three municipal utilities which challenge the disallowance of their

## I

### BACKGROUND

In 1976, MMWEC and PSNH entered into an Agreement for Joint Ownership, Construction and Operation of New Hampshire Nuclear Units ("Joint Operating Agreement" or "JOA"), which entitled MMWEC to an ownership interest in the Seabrook, New Hampshire nuclear energy facility, and imposed certain management responsibilities on PSNH. In conjunction with the JOA, MMWEC and PSNH subsequently entered into an Agreement for the Sellback of Seabrook Capacity and Related Energy ("Sellback Agreement") whereby PSNH agreed to purchase, at MMWEC's request, a portion of the capacity and related energy accruing to MMWEC under the JOA. Seabrook's construction delays and regulatory difficulties led to legal disputes between MMWEC and PSNH as to their respective obligations under the JOA, which were resolved in a Memorandum of Understanding releasing PSNH from all obligations under the Sellback Agreement and from any claims by MMWEC relating to PSNH's management of Seabrook. Appellants attempted, without success, to prevent implementation of the Memorandum of Understanding, both in the bankruptcy court and in the courts of Massachusetts.

Ultimately, appellants filed proofs of claim in the PSNH chapter 11 reorganization proceeding, asserting rights as intended beneficiaries under the JOA and the Sellback Agreement between PSNH and MMWEC.[2] On February 16, 1989, PSNH

1. The appellants are Hudson Light and Power Department ("Hudson"), Peabody Municipal Light Plant ("Peabody"), and West Boylston Municipal Light Plant ("West Boylston").

2. Under the Sellback Agreement, appellants asserted a right to require PSNH to purchase their excess electric power; under the JOA, appellants demanded damages for PSNH's alleged misman-

filed a motion for partial summary judgment, demanding disallowance of that portion of Hudson's proof of claim which is based on Hudson's alleged status as an intended beneficiary under the Sellback Agreement and JOA. The motion for partial summary judgment on Hudson's intended beneficiary claim ultimately was opposed by Hudson and fourteen other Massachusetts utilities, including appellants Peabody and West Boylston, all of which had filed proofs of claim based *exclusively* on their alleged status as intended beneficiaries under the Sellback Agreement and JOA.

At the hearing on March 17, 1989, it was agreed by all parties, with the express approval of the bankruptcy court, that the PSNH motion for partial summary judgment against Hudson would be deemed a motion for disallowance of the intended beneficiary claims of the fourteen other claimants as well. At the conclusion of the March 17 hearing, the motion for partial summary judgment was granted from the bench. On March 22, the clerk of the bankruptcy court docketed an order granting partial summary judgment against all fifteen claimants.[3]

■ On March 30, Hudson and Peabody filed a motion for reconsideration of the March 22 order, which had the unintended effect of nullifying their simultaneous notice of appeal.[4] *In re Public Service Co. of New Hampshire*, 898 F.2d 1, 1–2 (1st Cir. 1990). *See* Bankruptcy Rule 8002(b) ("A notice of appeal filed before the disposition of [a motion for reconsideration] shall have no effect; a new notice of appeal must be filed.").[5]

Thereafter, Hudson and Peabody, as well as West Boylston, submitted a request for certification of the finality of the March 22 order, *see* Bankruptcy Rule 7054(a); Fed.R. Civ.P. 54(b), which was granted by the bankruptcy court and entered on its docket August 14, 1990. Appellants promptly filed notices of appeal. The district court affirmed the summary judgment in favor of PSNH, thus disallowing appellants' intended beneficiary claims, and this appeal followed.

## II

## DISCUSSION

### A. JURISDICTION

PSNH contends at the outset that the appeals to the district court were time-barred, as the March 22 order granting partial summary judgment to PSNH, and disallowing the intended beneficiary claims of all fifteen claimants, became final on entry, and the only arguably efficacious notices of appeal were not filed until almost seventeen months later. Appellants counter that the March 22 order did not become final until August 14, 1990, when the bankruptcy court entered its certification of finality, pursuant to Bankruptcy Rule 7054(a) and Fed.R.Civ.P. 54(b), together with the separate document required by Bankruptcy Rules 7054(a), 9021 & 5003(a)

---

agement of Seabrook. One of the three appellants, Hudson, advanced a further ground for its mismanagement claim against PSNH, based on the ownership interest Hudson acquired as a *party* to the JOA. There are no mismanagement claims involved in the present appeal.

3. The document entered on March 22 is entitled: "Order Granting Motion of Public Service Company of New Hampshire For Partial Summary Judgment" ("March 22 order"). On March 27, the bankruptcy court issued its "Findings and Conclusions Regarding Hudson and Other Utility Claims," essentially recasting the oral findings and conclusions announced from the bench on March 17.

4. The motion for reconsideration was denied on March 31, following hearing.

5. The motion for reconsideration was filed within the ten-day period prescribed by Fed.R.Civ.P. 59(b), (e), made applicable in modified form by Bankruptcy Rules 3008 and 9023 in all cases under the Bankruptcy Code. The motion was in the nature of a motion for new trial or rehearing, as contemplated by Fed.R.Civ.P. 59. Thus, it appears that it was not a Fed.R.Civ.P. 60(b) motion. Civil Rule 60(b) states: "A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation." *See In re Aguilar*, 861 F.2d 873, 874 (5th Cir.1988) (per curiam) (motion for reconsideration filed within ten-day period treated as rule 59 motion which suspends appeal period pending resolution of motion); *see also* Bankruptcy Rules 8002(b)(3), (4).

and Fed.R.Civ.P. 54(a) & 58. We need not address the jurisdictional claims, however, as our review demonstrates that PSNH must prevail on the merits in any event. *See Norton v. Mathews*, 427 U.S. 524, 532, 96 S.Ct. 2771, 2775, 49 L.Ed.2d 672 (1976) (reserving difficult jurisdictional issue where case would be "resolved on the merits in favor of the same party"). *See also United States v. Parcel of Land with Building*, 928 F.2d 1, 4 (1st Cir.1991); *Caribbean Transp. Sys., Inc. v. Autoridad de Las Navieras*, 901 F.2d 196, 197 (1st Cir. 1990).

## B. MERITS

### 1. *Intended Beneficiary Claims*

After entering into individual Power Sales Agreements ("PSAs") with 33 municipal utilities in 1979, MMWEC set about acquiring a six percent interest in Seabrook ("Project Six"). The PSAs entitle each participating utility to a prescribed portion of Project Six capacity from MMWEC and obligate the participating utility to remit monthly payments for its ratable share of Project Six costs—notably including MMWEC bond service—even during periods when Project Six is not generating power. Thus, the PSAs were structured to enable MMWEC to raise approximately $335,000,000 with which to finance its acquisition of Project Six through the issuance of tax exempt bonds.[6]

MMWEC represented to prospective Project Six participants that it would be entering into a collateral agreement—the Sellback Agreement—whereby PSNH would agree to purchase a substantial portion of Project Six capacity *should MMWEC wish to sell*. MMWEC covenanted in each PSA to use its "best efforts" to "sell and transfer" any portion of the participant's share of Project Six capacity deemed excessive by the participant. PSNH was cognizant of MMWEC's "sales pitch" to Project Six participants.

Appellants assert rights as intended beneficiaries under the Sellback Agreement,[7] which provides that Massachusetts law shall govern its interpretation. Massachusetts decisional law comports with the third party beneficiary rules in Restatement (Second) of Contracts § 302, *see Rae v. Air–Speed, Inc.*, 386 Mass. 187, 435 N.E.2d 628, 632 (1982):

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties *and either*
>
> (a) the performance of the promise will *satisfy* an obligation of the promisee to *pay money* to the beneficiary; *or*
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) an incidental beneficiary is a beneficiary who is not an intended beneficiary.[8]

**6.** MMWEC is authorized to sell the capacity and output of electric power facilities acquired through its issuance of tax exempt bonds secured by assignments of MMWEC contract and revenue rights in the acquired facilities. 1975 Massachusetts Acts ch. 775, §§ 4(p), 6(a), 8(a), 9 & 10(a). Among the contract rights assigned to secure the Project Six tax exempt bonds was MMWEC's right to payment from Project Six participants under the PSAs.

**7.** Hudson and Peabody previously attempted extrication from their present predicament in a variety of ways. First, as alleged intended beneficiaries of the Sellback Agreement and the JOA, they attempted, in Massachusetts Superior Court, to enjoin MMWEC from entering into the Memorandum of Understanding with PSNH. Second, they refused to pay MMWEC pursuant to their Project Six PSAs, forcing MMWEC to commence injunctive proceedings to compel

payment. Hudson and Peabody again asserted third party beneficiary rights in defense, arguing, as they must in the instant case, that their "rights" under the Sellback Agreement could not be relinquished without their approval. Justice Wilkins, sitting as *nisi prius* justice, held their intended beneficiary claims "meritless." *Hudson Light and Power Dep't v. MMWEC*, No. 89–225, slip op. at 2 (Mass. June 2, 1989). Third, Hudson and Peabody attempted to prevent the bankruptcy court from approving the Memorandum of Understanding. Although Hudson and Peabody may well be flogging a dead horse, absent the interposition of an issue-preclusion or claim-preclusion defense by PSNH we examine the remains for signs of merit.

**8.** A promisor owes a duty of performance to any *intended* beneficiary of the promise, and "the intended beneficiary may enforce the duty," Restatement (Second) of Contracts § 304,

Restatement (Second) of Contracts § 302 (emphasis added). As appellants make no claim that performance by PSNH under the Sellback Agreement would satisfy an obligation on the part of MMWEC to *pay money* to appellants, *see* § 302(1)(a), *Rae,* 435 N.E.2d at 632, we address their intended beneficiary claims under section 302(1)(b).[9]

■ Under subsection 302(1)(b), the promise and its circumstantial setting must evince an intent on the part of the promisee to confer the benefit of the promised performance on the would-be beneficiary. "In such cases, if the beneficiary would be reasonable in relying on the *promise as manifesting an intention to confer a right on him* [to enforce the promise], he is an intended beneficiary." Restatement (Second) of Contracts § 302 commend (emphasis added) (quoted in *Rae,* 435 N.E.2d at 633 n. 3). It is clear from the focus of the section 302(1) inquiry that the requisite manifestation of the parties' intent may be evinced in the context, as well as the text, of the contract. *See Choate, Hall & Stewart v. SCA Serv., Inc.,* 378 Mass. 535, 392 N.E.2d 1045, 1051 (1979) ("We search for indicia of intention against the background of the transaction.") (citing preliminary draft of Restatement (Second) of Contracts § 302).[10]

■ The *structure* of the performance required under the particular contract often provides the critical indicum of intent in third party beneficiary cases. Unless the performance required by the contract will *directly* benefit the would-be intended beneficiary, he is at best an incidental beneficiary. *See Choate,* 392 N.E.2d at 1052; *Continental Bronze Co. v. Salvo & Armstrong Steel Co.,* 8 Mass.App. 799, 397 N.E.2d 1143, 1146 (1979); *cf. Gilmore v. Century Bank & Trust Co.,* 20 Mass.App. 49, 477 N.E.2d 1069, 1074 (1985). In the *Choate* case, for example, the Supreme Judicial Court of Massachusetts ("SJC") concluded that contractual terms requiring payment directly to the would-be intended beneficiary were pivotal to determining whether the contracting parties intended to benefit the third party. *Choate,* 392 N.E.2d at 1052.[11]

A few months after *Choate,* the Massachusetts Appeals Court entertained a materialman's intended beneficiary claim against a surety which had agreed to hold a general contractor harmless from claims incurred by subcontractors. *See Continental Bronze,* 397 N.E.2d at 1144. Analyzed in its setting, the indemnity contract was found to require performance directly to the general contractor, not to the subcontractors' creditors. Distinguishing

---

whereas an *incidental* beneficiary acquires "no right against the promisor or the promisee." *Id.* § 315.

9. Section 302, comment b, provides that a promise to perform an obligation which is readily convertible into a money obligation, such as a promise to deliver actively-traded commodities, may come within § 302(1)(a). "Less liquid obligations are left to Subsection (1)(b)." Restatement (Second) of Contracts § 302 comment b. Viewed most favorably to appellants, MMWEC's obligation to use its "best efforts" to dispose of Project Six capacity determined excess by the individual Project Six participants plainly is not "readily convertible" into money. Furthermore, PSNH merely promised to purchase from MMWEC predetermined maximum quantities of Project Six capacity, not to "satisfy" MMWEC's duty to use its "best efforts" in behalf of Project Six participants. *Compare* Restatement (Second) of Contracts § 302 comment b, illustration 2 (promise to *satisfy* promisee's duty to third person may give third person right to performance against promisor under § 302(1)(a)).

10. The Restatement draft cited in *Choate,*—Restatement (Second) of Contracts § 133 (Tent. Drafts Nos. 1–7, 1973)—is identical to current § 302. *See* Restatement (Second) of Contracts § 302, reporter's note at 445.

11. Although the plaintiff law firm in *Choate* is described as a "creditor type" intended beneficiary, the SJC's overarching inquiry into the intentions of the contracting parties, as expressed in the contract and evinced in the setting in which the contract was made and to be performed, is instructive in any § 302 intended beneficiary case, since no intended beneficiary claim can succeed under section 302 absent a showing that "a right to performance in the beneficiary is appropriate to effectuate the intention of the parties." Restatement (Second) of Contracts § 302(1). *See Gilmore v. Century Bank & Trust Co.,* 20 Mass.App. 49, 477 N.E.2d 1069, 1074–75 (1985) (deriving intent of contracting parties from contract terms and setting) (§ 302 case). *See also supra* note 10.

*Choate,* the *Continental Bronze* court held that the plaintiff-materialman was "exclude[d] ... at the threshold from intended beneficiary status," since "the terms of the promised performance ... are restricted ... to benefit the general contractor." *Id.* 397 N.E.2d at 1146. Ever since *Choate* and *Continental Bronze,* Massachusetts courts steadfastly have refused to accord intended beneficiary status under a contract whose terms, interpreted in the particular transactional setting, do not provide for the benefits of performance to flow directly to the third party. *See Town of Northbridge v. Town of Natick,* 394 Mass. 70, 474 N.E.2d 551, 555 n. 3 (1985); *First Hartford Realty Corp. v. Corporate Property Investors,* 12 Mass. App. 911, 423 N.E.2d 1020, 1022 (1981) (applying New York law and Restatement (Second) of Contracts § 302). *See infra* note 16. We have discovered no Massachusetts decision sustaining an intended beneficiary claim where the promised performance would not *directly* benefit the third party.[12]

▪ The intended beneficiary claims in the instant case fail as a matter of law. The language employed in the Sellback Agreement, as well as the setting of its negotiation, execution and anticipated performance, evince the plain intention of the contracting parties *not* to confer on appellants a right to performance of PSNH's promise to MMWEC. Although it was clear from the start that appellants in all probability would derive benefit from PSNH's promised performance under the Sellback Agreement, there was never any question that: (i) PSNH was required to purchase no Project Six capacity except at the option of MMWEC; (ii) PSNH was required to direct all payments under the Sellback Agreement to MMWEC; and (iii) PSNH and MMWEC retained the exclusive right to modify the Sellback Agreement at any time. Consequently, PSNH could render full performance under the Sellback Agreement in every particular without appellants necessarily realizing any direct or indirect benefit whatever. The Sellback Agreement merely required PSNH to purchase portions of Project Six capacity at MMWEC's *option,* and it was for MMWEC, not PSNH, to allocate any benefits from PSNH's performance among the 33 Project Six participants. Thus, performance of PSNH's promise was in no manner contingent upon any consequential benefit to appellants, direct or indirect.[13] *See* 4 A. Corbin, *Corbin on Contracts* § 779D at 45–46 and § 800 at 174–175 (1951) (promise

12. The requirement that the promised performance directly benefit the putative intended beneficiary is not unique to Massachusetts. *See, e.g., In re New England Fish Co.,* 749 F.2d 1277, 1281 (9th Cir.1984) (applying law of Washington); *see also Choate,* 392 N.E.2d at 1052 n. 21 (citing cases); *cf. Moosehead San. Dist. v. S.G. Phillips Corp.,* 610 F.2d 49, 53 & n. 8 (1st Cir.1979) (decided under Restatement of Contracts § 133—predecessor to § 302). Professor Williston defined an "incidental beneficiary" as "a person who is neither the promisee of a contract nor the party to whom performance is to be rendered [but who] will *derive* a benefit from [the contract's] performance." 2 S. Williston, *A Treatise on the Law of Contracts,* § 402 at 1088 (3d ed. 1959) (emphasis added) (cited in *Plymouth Housing Auth. v. Town of Plymouth,* 401 Mass. 503, 517 N.E.2d 470, 472 (1988); *Continental Bronze,* 397 N.E.2d at 1146). The Restatement makes the identical distinction:

B promises A to pay whatever debts A may incur in a certain undertaking. A incurs in the undertaking debts to C, D and E. If the promise is interpreted as a promise that B will pay C, D and E, they are intended benefi-

ciaries under Subsection (1)(a); if the money is to be paid to A in order that he may be provided with money to pay C, D and E, they are at most incidental beneficiaries.

Restatement (Second) of Contracts § 302, illustration 3 (quoted in *Choate,* 392 N.E.2d at 1052 n. 21). Although the modern trend may be to relax the "flow of benefit" test, *see* Restatement (Second) of Contracts § 302 comment a, Massachusetts courts have yet to signal a change in course.

13. It would have been a simple matter indeed, *had the parties so intended,* for PSNH to promise to purchase excess Project Six capacity directly from the participants and to pay the participants directly, or to employ *its* best efforts to dispose of Project Six capacity deemed excessive by the participants. The failure of sophisticated parties to employ these straightforward contractual options compels the conclusion that the parties *purposefully* interposed MMWEC between PSNH and the Project Six participants, which in turn reinforces our reluctance to contrive an intention the parties elected not to express.

cannot be considered "intended" for benefit of third persons where its performance would not necessarily benefit them, as where benefit to third persons depends on intervening voluntary action of promisee).

Our analysis of other Massachusetts cases corroborates the *incidental* character of any third party benefits under the Sellback Agreement. An apt example is *Choate*, 392 N.E.2d 1045, where the plaintiff law firm was retained by one Steir, a former director of the defendant corporation which had agreed to hold Steir harmless from certain legal expenses. A dispute between the indemnitee, Steir, and the indemnitor corporation prompted the latter to refuse performance. *Id.* at 1047–48. The plaintiff law firm was held to be an " 'intended' beneficiary of the 'creditor' type" because the indemnity contract, viewed in the context from which it emerged, provided for payments "direct" to plaintiff. *Id.* at 1052.[14]

The *Choate* transaction is indistinguishable from the present case in all material respects,[15] except that neither the text nor the context of the Sellback Agreement is reasonably susceptible to the interpretation that the benefits of performance were to run directly to the appellants. Unlike the plaintiff in *Choate*, appellants were not intended beneficiaries under the Sellback Agreement, since the performance promised by PSNH would neither necessarily nor directly benefit appellants.[16]

Even assuming that the express provisions of the Sellback Agreement directing the benefits of performance to MMWEC would not preclude intended beneficiary status "at the threshold," *Continental Bronze*, 397 N.E.2d at 1146, there are several other indicia of the contracting parties' intent that appellants were to be mere incidental beneficiaries.

First, the Sellback Agreement expressly provides that it may be modified simply by agreement of the parties. Sellback Agreement art. XVI, ¶ d ("This Agreement may be modified only by an instrument in writing signed by the duly authorized representatives of the Parties hereto."). Thus, whatever derivative rights appellants may have anticipated under the Sellback Agree-

---

**14.** The *Choate* court cites with apparent approval to *Stephens v. Great Southern Savings & Loan Assoc.*, 421 S.W.2d 332 (Mo.App.1967). *Choate*, 392 N.E.2d at 1052 n. 21. In *Stephens*, a contractor asserted intended beneficiary status under a bank's agreement to lend money to the owner of a parcel of land on which the contractor was to construct a project. The loan proceeds were to be placed in escrow, and *the land owner promised the bank* that he would pay for all material and labor used on the project. The court nevertheless held that the contractor was merely an "incidental beneficiary" of the bank's promised loan to the land owner, because the bank's performance of its promise to the owner would not have benefited the contractor directly. *Id.* at 336.

Unlike the land owner in *Stephens*, MMWEC never agreed *with PSNH* that its Sellback Agreement rights against PSNH would be applied to the direct benefit of Project Six participants. For that matter, appellants would not have been intended beneficiaries even if MMWEC had made such a promise, since the Sellback Agreement makes no provision for PSNH to render performance to appellants, or even to benefit appellants indirectly absent MMWEC's independent determination to allocate among appellants and other Project Six participants the benefits of any performance MMWEC might require of PSNH. *See Choate*, 392 N.E.2d at 1052.

**15.** Appellants entered into their PSA's with MMWEC in reliance on PSNH's promised performance under the Sellback Agreement. Disputes between MMWEC and PSNH led to cancellation of the Sellback Agreement.

**16.** In another analogous case, the Massachusetts Appeals Court held that a sole general partner was not an intended beneficiary under a land sale contract which promised performance to the limited partnership, notwithstanding that "the flow of funds to the partnership would have redounded to the significant financial benefit of [the general partner]." *First Hartford Realty*, 423 N.E.2d at 1022. Although *First Hartford* applied New York law, the Massachusetts Appeals Court relied on Restatement (Second) of Contracts § 302 illustration 3, ·which has been followed by New York courts. *See Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 495 N.Y.S.2d 1, 485 N.E.2d 208, 212 (1985) (Restatement (Second) of Contracts § 302 "formulations state the essence of the prior holdings of this court"); *e.g., Salzman v. Holiday Inns, Inc.*, 48 A.D.2d 258, 369 N.Y.S.2d 238, 242 (1975) (quoting Restatement of Contracts § 133 illustration 9—identical in all material respects to Restatement (Second) of Contracts § 302 illustration 3), *modified on other grounds*, 40 N.Y.2d 919, 389 N.Y.S.2d 576, 358 N.E.2d 268 (1976).

ment were explicitly made subject to extinguishment at the exclusive option of PSNH and MMWEC. Any right of recourse on the part of the appellants would have been for possible breach of MMWEC's "best efforts" covenant in the PSAs. Any reliance on the Sellback Agreement as manifesting an intention on the part of MMWEC and PSNH to confer rights on appellants would not have been reasonable.[17]

Second, a third party right of enforcement under the Sellback Agreement would be inconsistent with the particular sellback arrangement structured by the parties. MMWEC was much more than a token intermediary between PSNH and the individual Project Six participants. For example, the Sellback Agreement requires yearly notice to PSNH as to the total amount of Project Six capacity MMWEC will require PSNH to purchase during the ensuing sixty months.[18] Thus, at least annually, MMWEC would need to (i) obtain one to five year commitments from the individual participants to sell a portion of their respective shares of Project Six capacity, and (ii) apportion among the participants the benefits accruing from MMWEC's sale of Project Six capacity to PSNH.

Finally, the attempt by appellants, as supposed intended beneficiaries, to impede MMWEC's exercise of its exclusive contractual right to enter into an agreement with PSNH to modify the Sellback Agree-

ment cannot be reconciled with the legal and financial environment in which the Sellback Agreement and the PSAs were negotiated, executed, and to be performed. MMWEC was authorized to raise capital only through recourse to the tax exempt bond market, 1975 Massachusetts Acts ch. 775, §§ 8(a) & 9.[19] The contractual and regulatory constraints peculiar to the domain of public utility finance confirm our conclusion that the Sellback Agreement and the PSAs were *designedly* structured to enable MMWEC to obtain the bond financing upon which its ability to secure sources of electric power for its member utilities was entirely dependent. In these circumstances, appellants' initiative would not only alter the legal ground rules expressly endorsed by the parties to the Sellback Agreement and all parties to the PSAs, but realign the financial obligations upon which bondholders, nonparties to either the Sellback Agreement or the PSAs, relied. The conclusion that a nonparty possessed the right to prevent the contracting parties from exercising their exclusive option to modify the Sellback Agreement would undermine MMWEC's ability to borrow and repay capital. Thus, it cannot reasonably be inferred that MMWEC, let alone PSNH, intended to confer on appellants a right to performance under an agreement which expressly establishes a *bilateral* contractual relation.[20] *Cf.* Restatement (Second) of Contracts § 302 com-

**17.** It has been held that a contract may be rescinded or modified without the consent of an *intended* beneficiary, provided the contract contains an express reservation of the parties' right. *See* 17A Am.Jur.2d *Contracts* § 462 (1991); E. Farnsworth, *Contracts*, § 10.8 at 771 & n. 14 (1990) (Reporter, Restatement (Second) of Contracts). *E.g., United States v. Wood,* 877 F.2d 453, 458 (6th Cir.1989) (applying law of Kentucky); *Biggins v. Shore,* 523 Pa. 148, 565 A.2d 737, 739–42 (1989) (plurality opinion); *McDaniel Title Co. v. Lemons,* 626 S.W.2d 686, 691–92 (Mo.App.1981).

**18.** Each yearly 60–month notice necessarily overlaps the last 48 months covered in the previous notice. Under the terms of the Sellback Agreement, MMWEC's yearly notice could revise MMWEC's previous requests for the overlap period by as much as 12 megawatts per year.

**19.** *See supra* note 6.

**20.** As cogently noted on an earlier occasion when Justice Wilkins rejected an attempt by Hudson and Peabody to avoid payments to MMWEC under the PSAs (on the theory that they were intended beneficiaries under the abrogated Sellback Agreement):

[f]inancing for municipal purposes in this Commonwealth would be seriously impaired if an obligation to repay borrowed funds [appellants' obligation under the PSAs] could be undercut by the failure of the public entity that is borrowing the money [MMWEC] to meet a condition [continuing existence of the Sellback Agreement] not expressed in a statute or in the loan documents.

... Success on [appellants'] claim would ... tend to raise interest rates on future bond obligations such as are involved in this case. *Hudson Light & Power Dep't v. MMWEC,* No. 89–225, slip op. at 2 and 4 (Mass. June 2, 1989). *See supra* note 7.

ment d (when manifestation of intention to confer a right is uncertain, court may look to factors independent of the parties' intention, such as overriding policy). Moreover, given the customary contractual and regulatory constraints prevalent in the legal and financial setting in which the Sellback Agreement and the PSAs were to be performed, appellants could not reasonably imply a right to enforce performance by PSNH which did not comport with the express terms of the parties' agreement.

As the record before the bankruptcy court raises no genuine issue of fact material to appellants' asserted status as intended beneficiaries under the Sellback Agreement, and as PSNH was entitled to judgment as a matter of law, the entry of summary judgment was proper. *See Siegal v. American Honda Motor Co.,* 921 F.2d 15, 17 (1st Cir.1990).

### 2. *Promissory Estoppel*

■ Appellants attempt to interpose a promissory estoppel claim as an alternative basis for their asserted right to performance under the Sellback Agreement. Appellants predicate their promissory estoppel claim not on Massachusetts decisional law but exclusively on the caselaw of the supreme courts of Hawaii and Wisconsin, which have permitted a third party action against a promisor where it appears that the third party foreseeably and detrimentally relied on the promise. *See Silberman v. Roethe,* 64 Wis.2d 131, 133, 218 N.W.2d 723, 731 (1974); *Ravelo v. County of Hawaii,* 66 Haw. 194, 658 P.2d 883, 887 (1983). Appellants neither cite to relevant Massachusetts authority nor attempt to demonstrate that the SJC, given the opportunity, would extend the doctrine of promissory estoppel to nonparties;[21] indeed, our research has disclosed that only five courts have taken the suggested step. *See Ravelo,* 658 P.2d at 887; *Silberman,* 218 N.W.2d at 731; *Dallum v. Farmers Union Central Exchange,* 462 N.W.2d 608, 613–14

(Minn.App.1990); *Burgess v. California Mut. Bldg. & Loan Assoc.,* 210 Cal. 180, 290 P. 1029, 1031–32 (1930); *Lear v. Bishop,* 86 Nev. 709, 476 P.2d 18, 22 (1970). *See generally* Metzger & Phillips, *Promissory Estoppel and Third Parties,* 42 Sw. L.J. 931 (1988).

As appellants can point to no authoritative indication that Massachusetts would extend the protection of promissory estoppel to nonparties, we decline their tenuous invitation to blaze new trails in Massachusetts substantive law. *See In re Lenard,* 849 F.2d 974, 978 (5th Cir.1988) (court exercising bankruptcy jurisdiction will not " 'adopt innovative theories of recovery or defense' when construing state law, but 'simply ... apply that law as it currently exists' ") (footnote omitted); *In re Martin Grinding & Mach. Works, Inc.,* 793 F.2d 592, 598 n. 6 (7th Cir.1986) (court exercising bankruptcy jurisdiction "will not adopt innovative rules of state law" without clear guidance from state court).

### 3. *Discovery Claim*

■ As their final claim of error, appellants contend that the bankruptcy court erroneously denied their Fed.R.Civ.P. 56(f) discovery motion. *See* Bankruptcy Rules 7056 and 9014. We review the denial of a rule 56(f) motion for abuse of discretion. *Price v. General Motors Corp.,* 931 F.2d 162, 164 (1st Cir.1991). Rule 56(f) permits the trial court to order, among other things, a continuance of the summary judgment proceedings to enable the nonmoving party to undertake further discovery. Hudson asserts that further opportunity for discovery might have disclosed relevant evidence relating to the contracting parties' intent in entering into the Sellback Agreement. As previously discussed, however, only the *manifested* intent of the contracting parties is material to the third party beneficiary analysis. *See supra* pp. 9–10. As appellants have not made the requisite showing that further discovery could lead

---

**21.** Hudson cites one Massachusetts case, *McAndrew v. School Comm. of Cambridge,* 20 Mass. App. 356, 480 N.E.2d 327, 332 (1985), which quotes Restatement (Second) of Contracts § 90(1). Although section 90(1) itself applies

promissory estoppel to third parties as well as promisees, *McAndrew* was not a third party case, made no reference to third party rights, and did not purport to adopt Restatement (Second) of Contracts § 90 as Massachusetts law.

to information "reasonably calculated to lead to the discovery of admissible evidence," *see* Fed.R.Civ.P. 26(b)(1); 56(f), the denial of their motion was not an abuse of discretion. *See* Fed.R.Civ.P. 26(b)(1) ("Parties may obtain discovery regarding any matter ... which is relevant to the subject matter involved in the pending action"); *Assoc. for Reduction of Violence v. Hall,* 734 F.2d 63, 67 (1st Cir.1984) (district court has discretion under rule 26(b)(1) to prevent discovery on grounds of irrelevance) (dictum). *See generally Hickman v. Taylor,* 329 U.S. 495, 507–08, 67 S.Ct. 385, 391–92, 91 L.Ed. 451 (although discovery rules "are to be accorded a broad and liberal treatment ... limitations come into existence when the inquiry touches upon the irrelevant").

## III

### CONCLUSION

The present appeal concludes the fourth attempt by Project Six participants to escape the consequences of the contracting parties' decision to terminate the Sellback Agreement. Abrogation of the Sellback Agreement was part of the package settlement which enabled MMWEC to obtain significant PSNH concessions which ultimately benefited all Project Six participants. Dissatisfied and unable to prevent implementation of the settlement directly, appellants asserted derivative sellback agreement rights against PSNH as intended beneficiaries. Appellants' intended beneficiary claims must yield, as a matter of law, to the numerous indicia of the contracting parties' intent not to confer upon appellants a right to performance under the Sellback Agreement, including the plain contract language reserving to PSNH and MMWEC the exclusive right to modify the Sellback Agreement.

*Affirmed; costs to appellee.*