**INTERSTATE COMMERCE COMMISSION, Plaintiff, Appellee,**

v.

**HOLMES TRANSPORTATION, INC., Defendant, Appellee.**

**Robert C. Holmes and Dorothy Holmes, Trustees of the Alvin R. Holmes Fund, Robert C. Holmes, Individually, and J. Robert Seder, Intervenors, Appellants.**

Nos. 90–1208, 92–1507.

United States Court of Appeals, First Circuit.

Submitted Sept. 3, 1992.

Decided Jan. 15, 1993.

John Woodward, with whom Burton C. Chandler, Seder and Chandler, Worcester, MA, Andrew Z. Schwartz, Michele A. Whitman and Foley, Hoag & Eliot, Boston, MA, were on brief for intervenors, appellants.

Stuart E. Robbins, Boston, MA, for plaintiff, appellee.

Frank J. Weiner, Boston, MA, for defendant, appellee.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Robert C. Holmes, individually and as trustee of the Alvin R. Holmes Fund ("Holmes Trust"), and Dorothy Holmes, as trustee of the Holmes Trust (hereinafter, collectively, "Holmes parties"), appeal a district court order directing the disbursement of an escrow fund established to defray certain civil liabilities relating to their sale of Holmes Transportation, Inc. ("HTI"), a corporation wholly owned by the Holmes parties. The Holmes parties are joined on appeal by J. Robert Seder, Esquire, a former escrow agent for the fund. Appellate jurisdiction having been retained, and certain preliminary matters having been resolved on remand, we proceed to the merits and affirm the district court order.

## I

### BACKGROUND

First we describe the somewhat intricate context in which the present litigation developed. The Holmes parties entered into negotiations in 1988 to sell HTI to Route USA Resources, Inc. ("Route USA"), a corporation wholly·owned and controlled by Manfred Ruhland. Throughout the negotiations, Seder represented the Holmes parties, and Robert D. Gunderman, Esquire, represented Ruhland and Route USA. Ruhland had assumed control of HTI, and consummation of the sale of HTI to Route USA appeared imminent, when the Interstate Commerce Commission ("ICC") initi-

ated the present action against HTI on July 13, 1988, to recover $501,976 in refunds allegedly due HTI customers for freight overpayments improperly withheld by HTI during the period 1984–1988 ("ICC refunds").[1]

The ICC action threatened to derail the HTI sale, as Ruhland demanded a reduction in the purchase price to offset HTI's contingent liability on the ICC refund claims. In order for the HTI sale to proceed, the Holmes parties agreed to escrow $500,000 of Ruhland's purchase money deposit to defray the ICC refund claims against HTI (the "private escrow agreement"). On September 22, 1988, Seder executed the private escrow agreement as "attorney in fact" for the Holmes parties; Ruhland executed it in behalf of Route USA; Seder and Gunderman executed it as designated escrow agents under the private escrow agreement. With the ICC refunds obstacle apparently resolved, Ruhland abandoned the demand for a reduction in the HTI purchase price, and the Holmes parties' sale of HTI's stock to Route USA was consummated without further incident.

While the private escrow agreement was being negotiated, HTI proposed a settlement of the ICC refund claims. On December 12, 1988, HTI, represented by Gunderman, consented to the entry of a district court injunctive decree ("consent decree") mandating, in pertinent part, that HTI establish an escrow fund containing at least $502,000 with which all HTI customer overpayments were to be refunded by December 31, 1988. For reasons which remain unclear, neither the ICC nor the district court had yet been apprised of the private escrow agreement previously executed between the Holmes parties and Route USA. Thus, the escrow account arrangements envisioned in the December 12 consent decree varied in considerable detail from the terms of the private escrow agreement between the Holmes parties and Route USA.[2] Their function was identical, however: to establish and preserve a fund for defraying the ICC refunds determined to be due HTI's overcharged customers in the present action.

The Holmes parties were not parties to the present action at the time the consent decree was entered. At the insistence of the ICC, however, the consent decree was executed by Seder, who had represented the Holmes parties throughout the HTI negotiations with Ruhland and Route USA. As Gunderman and HTI (but not the ICC) were well aware, of course, Seder and Gunderman were the designated escrow agents under the private escrow fund. No refunds were ever disbursed.

On July 14, 1989, Ruhland sold HTI to Anthony Matarazzo. Matarazzo was notified of the ICC action against HTI, but was informed by Gunderman that the ICC refund claims were "already taken care of" and that a $500,000 escrow account had been set aside to defray the refunds. The Holmes parties had other plans for the escrowed funds. On July 18, 1989, the Holmes parties initiated a declaratory judgment action in Massachusetts Superior Court, to recoup the funds deposited pursuant to the private escrow agreement. Meanwhile, the ICC became aware that the

---

1. The ICC complaint did not name the Holmes parties as defendants, but alleged that HTI failed to process and refund 3,048 unidentified payments and 3,485 duplicate payments received from shippers, in violation of 49 C.F.R. §§ 1008.9(a) and 1008.9(b).

2. The private escrow agreement provided that (1) the refunds were to be made by HTI in the first instance, and reimbursed by the escrow fund in $25,000 increments upon certification by HTI; (2) the escrowed funds were to remain the property of the Holmes parties, and, if not disbursed by March 16, 1989, were to revert to them; (3) the escrowed funds were to be used only to defray obligations accruing prior to Feb-

ruary 3, 1988 (the date Ruhland assumed operational control of HTI); and (4) the escrow account was to be deposited in a state-chartered financial institution.

The consent decree, on the other hand, provided that (1) refund payments were to be made directly from the escrow account to the overcharged shippers; (2) all refunds (whether originating before or after February 3, 1988) were to be made from the escrow account; (3) the escrow account was not to terminate until all refunds were made; and only then were any undistributed funds to revert to HTI; and (4) the escrow account was to be established in a federally-chartered financial institution.

refunds required under the consent decree had not been disbursed.

On September 14, 1989, the ICC convened a meeting of persons associated with HTI and with the original lawsuit. At the meeting, the ICC was informed of the Holmes parties' state court lawsuit and was furnished for the first time with copies of the private escrow agreement. Matarazzo, in behalf of HTI, agreed to effect the overdue ICC refunds within 30 days, provided Seder and Gunderman, as escrow agents, would release the escrowed funds. Gunderman agreed. Seder declined, however, contending that (1) the Holmes parties' obligations under the private escrow agreement terminated on March 16, 1989, (2) Seder's signature had not bound the Holmes parties to the consent decree, and (3) the Holmes parties were therefore entitled to recover the funds in escrow.

On October 13, 1989, the Holmes parties and Seder intervened in the present action, demanding a judicial declaration entitling the Holmes parties to the escrow funds. The ICC countered with a civil contempt citation against Seder, Gunderman, Ruhland, Route USA, HTI, and Matarazzo. The ICC contended, *inter alia*, that Seder and Gunderman, by their execution of the consent decree, subjected the escrowed funds to the jurisdiction of the district court for disposition in accordance with the terms of the consent decree. The ICC further contended that Gunderman and Seder, as escrow agents, failed to provide prudent supervision relating to HTI's obligation to disburse the escrowed funds in accordance with the terms of the consent decree. A barrage of cross-claims and counterclaims ensued. On December 15, 1989, HTI filed a voluntary chapter 11 petition in the District of New Jersey.

On January 26, 1990, after an evidentiary hearing, the district court issued its findings of fact, and concluded, in pertinent part, that (1) the consent decree and the private escrow agreement were negotiated simultaneously as "synergistic" documents intended to ensure funding of the ICC refunds anticipated under the consent decree; (2) the consent decree was executed by Seder as attorney for the Holmes parties and as a designated escrow agent under the private escrow agreement; and (3) the consent decree was "the only operative document" defining the legal obligations of Seder and Gunderman relating to disbursements from the escrow fund. The district court rejected the Holmes parties' claims to the escrow fund, and held HTI and Seder in civil contempt for refusing to disburse the ICC refunds pursuant to the consent decree.[3] Seder and Gunderman were replaced as escrow agents by Frank Weiner, an HTI attorney, who was directed to disburse the ICC refunds by March 30, 1990. We stayed disbursements pending appeal.

On April 1, 1992, following remand, *see ICC v. Holmes Transp., Inc.*, 931 F.2d 984 (1st Cir.1991), the district court vacated its contempt finding against Seder and Gunderman,[4] but reaffirmed its order directing disbursement of the ICC refunds from the escrow fund in accordance with the terms of the consent decree. Appellants now challenge the district court order entered on remand.

## II

## DISCUSSION

As they were not named in the consent decree or in the underlying ICC action,

---

**3.** Gunderman's civil contempt was deemed purged by his earlier agreement to transfer the escrow funds in accordance with the consent decree.

**4.** Since Seder's removal as escrow agent terminated whatever interest he asserted as a declaratory judgment plaintiff, we conclude that Seder lacks appellate standing. *See United States v. Little Joe Trawlers, Inc.*, 780 F.2d 158, 161 (1st Cir.1986) ("[t]o have standing to appeal, an appellant ordinarily must have been a party to the proceeding below, and have been aggrieved by

the order appealed from.... '[A]lthough a party may have an appealable interest at the commencement of a suit, if that interest has terminated before the entry of a judgment or decree sought to be appealed from, he cannot appeal' "). Accordingly, Seder's appeal of the original contempt finding (based, *inter alia*, on the vagueness of the consent decree, *see* Fed. R.Civ.P. 65) has been mooted. Except as otherwise indicated, therefore, we refer to the Holmes parties as appellants.

**1126**

appellants contend that the district court lacked authority to subject them and the private escrow fund to the terms of the consent decree. We disagree.

The thrust of their argument is that the private escrow agreement and the district court consent decree contemplated *separate* and *unrelated* funds from which the ICC refunds would be disbursed: a "private escrow fund," established under the escrow agreement and belonging to the Holmes parties, which lay beyond the jurisdictional reach of the district court; and an "ICC fund," established by the consent decree, which was within the control of the court but imposed legal obligations *only on HTI.* To the extent that the district court purportedly subjected their privately-created fund to the consent decree, the Holmes parties contend that it lacked jurisdiction and disregarded the express terms of their private escrow agreement. To the extent that the consent decree directed disbursements from the escrow fund identified in the consent decree, the Holmes parties argue that—as nonparties to the underlying action—they were not bound by the terms of the consent decree. *See* Fed.R.Civ.P. 65(d) (injunction "binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise"); *G. & C. Merriam Co. v. Webster Dictionary Co.,* 639 F.2d 29, 35 (1st Cir.1980) ("[t]o hold a nonparty bound by an injunction it is thus essential to prove either that the nonparty participated in the contumacious act of a party or that the nonparty was subject to the injunction because legally identified with a party"). The determinative difficulty with appellants' conclusion lies in its faulty premise— that there were two separate and unrelated funds.

After carefully reviewing the relationship of the parties, as well as the circumstances surrounding the drafting of the escrow agreement and the consent decree, and based on its "intimate understanding of the history and circumstances of th[e ICC] litigation," *see United States v. Massachusetts,* 890 F.2d 507, 510 (1st Cir.1989), the district court determined that the private escrow agreement and the consent decree were "synergistic documents," negotiated simultaneously, which contemplated a *single* escrow fund—comprised of the HTI purchase monies received by the Holmes parties from Ruhland to underwrite HTI's contingent liability for any ICC refunds determined due in the present action. *See Chelsea Indus., Inc. v. Florence,* 358 Mass. 50, 55–56, 260 N.E.2d 732 (1970) (if part of "same transaction," separate contracts may be read together as integrated agreement); *see also Gilmore v. Century Bank & Trust Co.,* 20 Mass.App.Ct. 49, 50, 477 N.E.2d 1069, 1073 (1985) (whether two instruments derive from "same transaction" is question of fact for court, to be determined by "such factors as simultaneity of execution, identity of subject matter and parties, cross referencing, and interdependency of provisions"). The district court found that the Holmes parties, through Seder's execution of the December 1988 consent decree, authorized HTI to utilize their interest in the escrowed funds to effectuate the intended purpose. As HTI is a party to the present action, the district court properly held that it possessed jurisdiction over any interest HTI retained in the escrowed funds.

Since the district court ruling was based, quite properly, on extrinsic evidence of the parties' intent, both as concerns the private escrow agreement and the consent decree, *see Gilmore,* 20 Mass.App.Ct. at 50, 477 N.E.2d at 1073; *see also, e.g., Brennan v. Carvel Corp.,* 929 F.2d 801, 808 (1st Cir.1991) (considering extrinsic evidence to elucidate ambiguous relationship between parties' prior agreements), we review its findings only for "clear error." *See Gel Systems, Inc. v. Hyundai Eng'g & Constr. Co.,* 902 F.2d 1024, 1027 (1st Cir. 1990) ("clear error" review where court utilizes extrinsic evidence, as well as documents, to interpret parties' ambiguous contractual relationship); *cf. Navarro–Ayala v. Hernandez–Colon,* 951 F.2d 1325, 1340, 1343 n. 21 (1st Cir.1991) ("ordinary contract principles" and standards of review should

be used to interpret "the scope of the parties' original bargain" in public consent decree).

### 1. The "Single–Fund" Premise

We discern no error in the district court ruling that a single fund was contemplated by the parties to the private escrow agreement and the consent decree. The "single-escrow fund" ruling was supportably based on the following findings: (1) the parties to the private escrow agreement were aware of the impending injunctive decree and even made reference to it in the private escrow agreement; (2) the purpose of the parties to the private escrow agreement was to fund the ICC refunds determined due by HTI in the present action; and (3) the consent decree—referring to but one escrow fund (and there being no evidence of another fund)—was signed by Gunderman *and by Seder as representative for the Holmes parties.*[5]

Similarly, it is relevant that the ICC, envisioning a single escrow account from which the freight refunds would be made, *requested that the injunctive decree be forwarded* to Seder, as the legal representative of the Holmes parties, providing clear evidence that the ICC likewise recognized the obligation of the Holmes parties to facilitate disbursement of the ICC refunds.[6] The understanding of the parties, as well as their conduct, plainly comports with the district court's view of the private escrow agreement and the consent decree as "synergistic documents" whose function was to enable payment of the ICC refunds owed by HTI. Taken together, the evidence provides ample support for the district court findings. Nor are its findings impeached by the discrepancies in the documents to which appellants point. Rather, these discrepancies give rise at most to another plausible view of the evidence. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 152 (1st Cir.1990) (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 574, 105 S.Ct. 1504, 1511, 1511–12, 84 L.Ed.2d 518 (1985)).[7]

**5.** Moreover, since subsequent conduct of the parties to a consent decree may aid the interpretation of its intended scope, *see Navarro–Ayala,* 951 F.2d at 1353 (Cyr, J., concurring in part), we likewise consider it significant that Ruhland represented to Matarazzo, during their negotiations for the second HTI sale, that the ICC refunds were "taken care of" by the private escrow fund. As owner of Route USA, the initial purchaser of HTI from the Holmes parties, and as the source of the funds deposited under the private escrow agreement, Ruhland clearly understood, prior to the onset of the present dispute, that the function of the private escrow agreement was to ensure the funding required to implement the consent decree.

**6.** Mr. Gunderman, an escrow agent, counsel to HTI, and the person who submitted the consent decree for signature by Seder, made the following representations to the court:

Mr. Robbins [an attorney for the ICC] alluded to negotiations that took place while the agreement was being finalized. I was the one that contacted Mr. Robbins, told Mr. Robbins that I am reading the order, the order calls for the creation of an escrow fund. I alerted him to the fact that there was, in fact, an escrow fund established, and did he want us to go through the exercise of closing one and opening a new one. Mr. Seder was clearly away aware of that [sic]. When the order was finalized, Mr. Robbins was aware, I was aware, and Mr. Seder was aware, that there was an escrow fund called for in the order, and that the private escrow fund, if you will, was intended to comply with the Court's order....

Thus, Gunderman's representations, as an officer of the court, though not evidence *per se,* reinforced the district court's determination that at least HTI, Ruhland, and the ICC envisioned the private escrow fund as the sole source of funding for the ICC refunds. Moreover, the district court finding that the Holmes parties acquiesced in the consent decree implementing this understanding cannot be considered clear error in light of Seder's execution of the consent decree in behalf of the Holmes parties and as an escrow agent under the private escrow agreement.

**7.** Most discrepancies between the documents, *see supra* note 2, are reconciled by according the consent decree its due as a mutual modification of the escrow agreement to effect their common purpose, *viz.,* to fund disbursement of the ICC refunds pursuant to the district court decree. Indeed, Escrow Agreement ¶ 11, on which the Holmes parties rest their claim to the escrowed funds, appears *explicitly* to *anticipate* voluntary modifications to its expiration date in light of a subsequent consent decree; it provides that the parties' escrow obligations will expire

### 2. *Seder's Capacity*

As countervailing evidence to the "single-escrow fund" theory, and as a separate basis for their claim to the escrowed funds, appellants contend that Seder did not sign the December 12 consent decree as their attorney, but rather as counsel to HTI. Therefore, they contend, the consent decree among Ruhland, HTI and the ICC did not bind them; rather, their rights and obligations continued to be governed by the private escrow agreement, which expired March 16, 1989, by its own terms.

■ Their argument is unavailing. Regardless whether Seder represented HTI or the Holmes parties, the district court finding that the escrowed funds were specifically dedicated to the settlement of HTI's contingent liabilities, and were unconditionally intended for that purpose, meant that there could be no entitlement to recoup the funds until the ICC refunds were paid. *See* 30A C.J.S. Escrows § 5(a) ("to constitute an instrument an escrow, it must be deposited with the intention that it shall take effect on the performance of an express condition or the happening of a certain event ... [T]he condition or event must be one in fact which will prevent the operation of the instrument until it is performed or occurs"); *see also Childs v. Harbor Lounge of Lynn, Inc.*, 357 Mass. 33, 35, 255 N.E.2d 606, 608 (1970).

■ In any event, the district court rejected the factual premise for appellants' argument, holding instead that Seder had executed the consent decree as counsel to the Holmes parties. As the determination of an attorney-client relationship is a question of fact, or, at most, a mixed question of law and fact, *see Industrial Bankers of*

*Massachusetts v. Reid, Murdoch & Co.*, 297 Mass. 119, 8 N.E.2d 19, 22 (1937) (attorney's authority to demand release of attachment, following alleged verbal authorization by owner of property, is "question of fact"); *see also Pedersen v. Leahy*, 397 Mass. 689, 690, 493 N.E.2d 486, 487 (1986) (where signature line of purchase agreement is ambiguous as to capacity of signing party, signatory's agency relationship ordinarily presents a question of fact), we review for "clear error." *Industrial Bankers*, 8 N.E.2d at 22; *see generally LoVuolo v. Gunning*, 925 F.2d 22, 25 (1st Cir.1991) ("clear error" review of mixed questions).

As the district court determined, *Gunderman*—not Seder—represented HTI at the time the consent decree was signed. Control of HTI had been transferred to Ruhland in February 1988; Gunderman served as Ruhland's counsel and as counsel to the company after that date. Seder, by contrast, represented the *Holmes parties*, not HTI, throughout the negotiations for the sale of HTI. There is no indication that Seder entered an appearance for HTI, participated in negotiations with the ICC, or rendered significant professional services to HTI in connection with the ICC refund claims. Prior to that time, Seder had never entered an appearance for HTI in the present litigation; never billed HTI for professional services in furtherance of its settlement with ICC; and never rendered significant professional services to HTI in connection with the ICC refund claims.[8] Furthermore, as the district court found, given his inexperience with ICC rules and regulations, there was little apparent reason for HTI to retain Seder in the present litigation.[9]

on "March 16, 1988, *or such later date as the parties may agree* in order to complete the review and repayment of all unidentified and duplicate payments."

**8.** Appellants contend that the material inquiry for purposes of determining the significance of Seder's signature on the consent decree is not Seder's actual role, but ICC's understanding of his role, since Seder signed the decree at ICC's behest. They argue that a September 14, 1988 letter, allegedly excluded improperly by the dis-

trict court, showed that the ICC understood that Seder was acting in behalf of HTI, not the Holmes parties. Our review of the September 14 letter persuades us that it is ambiguous as concerns Seder's role in negotiating the consent decree, and that its exclusion, even if erroneous, was harmless error.

**9.** Once again appellants point to contrary evidence, including the letter adverted to above, *see supra* note 8, and the fact that the consent decree contained no signature line for the

### 3. The Agency Question

Appellants further assert that even if Seder did sign the consent decree in their behalf, he had not been vested with the proper authority under Massachusetts law.

■ Although, under Massachusetts law, the "general powers" of an attorney to represent a client do not entail the authority either to settle a case, *see Precious v. O'Rourke*, 270 Mass. 305, 170 N.E. 110 (1930), or to make substantial modifications to an existing contract, *cf. Torrao v. Cox*, 26 Mass.App.Ct. 247, 525 N.E.2d 1349 (1988), the principal's consent to be bound may be implied by showing the agent's actual or apparent authority to act in the principal's behalf. An agent's actual authority to bind his principal may be implied under Restatement (Second) of Agency § 43 in circumstances where the principal has acquiesced in or adopted conduct by the agent which is reasonably considered to encompass the authority to undertake the subject conduct on the principal's behalf. *See LaBonte v. White Constr. Co.*, 363 Mass. 41, 292 N.E.2d 352, 355 (1973) (superintendent of schools held to be 'agent' of school district for purposes of receiving plaintiff's statement of claim, where superintendent was familiar with contract involved in litigation, and school district had acquiesced in superintendent's acceptance of other plaintiffs' claims on several prior occasions); *Hurley v. Ornsteen*, 311 Mass. 477, 42 N.E.2d 273 (1942) (existence of agency relationship may be implied from "course of conduct showing that a principal has repeatedly acquiesced therein and adopted acts of the same kind"); Restatement (Second) Agency § 43. In light of its finding that the private escrow agreement and the consent decree were "symbiotic" documents designed to serve the identical function, *viz.*, providing an indemnity fund for settling the ICC refund claims against HTI, the court supportably ruled that Seder's authority to negotiate and execute the escrow agreement in behalf of the Holmes parties implied the authority to modify the escrow agreement as necessary to implement settlement of the ICC refund claims in litigation.[10] After carefully reviewing the entire record, we find the force of the countervailing evidence proffered by appellants insufficient to produce a "definite and firm conviction that a mistake has been committed," *Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511 (stating "clear error" standard of review).[11]

Holmes parties. Their arguments are not compelling. Above Gunderman's signature on the consent decree appears the legend "Attorneys for Defendant," which reasonably can be read to refer to the Gunderman law firm. Although Seder's signature appears below Gunderman's, the document does not clearly identify Seder's affiliation with *any* particular party to the action. At best, the proffered evidence is ambiguous, suggesting an alternative inference which might reasonably be drawn, but not warranting reversal on "clear error" review. *See Cumpiano*, 902 F.2d at 152 (quoting *Anderson*, 470 U.S. at 573–74, 105 S.Ct. at 1511–12).

10. Implied authority might also be found under Restatement (Second) of Agency § 35 (1958), which provides that "unless otherwise agreed, authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or *are reasonably necessary to accomplish it*." (Emphasis added.) *See also, e.g., Transurface Carriers, Inc. v. Ford Motor Co.*, 738 F.2d 42, 45 (1st Cir.1984) ("the law of principal and agent is clear that conferring authority to conduct a transaction gives authority to undertake acts incidental to the transaction") (citing Massachusetts cases).

*Gordon v. O'Brien*, 320 Mass. 739, 71 N.E.2d 221 (1947), cited by appellants, is not to the contrary. In *Gordon*, the Supreme Judicial Court held that general authority to sell a property on a client's behalf could not be presumed from the fact that the parties' longtime attorney had sold another, *unrelated* property to a different party in a prior transaction. 320 Mass. at 741, 71 N.E.2d 221. Here, the district court reasonably inferred that Seder was authorized to sign the consent decree, based on the fact that Seder had signed a *closely related* document, the private escrow agreement, essentially involving the same parties and the same fund. The present case is closer to *United States v. Bosurgi*, 343 F.Supp. 815, 817 (S.D.N.Y.1972), *aff'd in pertinent part*, 530 F.2d 1105 (2d Cir. 1976), cited by neither party, in which an attorney, expressly retained to defend a lawsuit involving an escrow fund, was held to possess implied authority to receive process on the same client's behalf in separate litigation involving the same fund.

11. Since we affirm on the strength of the district court's ruling that Seder possessed implied authority to bind the Holmes parties, we need not reach its alternative holding, based on "apparent authority."

## III

## CONCLUSION

The district court did not exceed its authority by directing disbursements to the ICC refund claimants from the escrow fund established under the private escrow agreement. As the escrow fund was comprised of the monies Ruhland deposited with the Holmes parties for the purchase of HTI, and their private escrow agreement was specifically intended as an indemnity fund for settling HTI's contingent liabilities to the ICC refund claimants in the present litigation, the district court possessed jurisdiction over the escrow fund incident to its jurisdiction over HTI in the underlying ICC action.

*The district court order is affirmed, with costs to appellees. The order previously entered by this court, staying further disbursements from the escrow account, is vacated. The case is remanded to the district court for further proceedings consistent herewith.*[12]

---

12. Since neither party has demonstrated the likelihood of a residue in the escrow account following disbursements to the ICC refund claimants, any dispute over a residue is unripe for decision. *See Massachusetts Ass'n of Afro-American Police, Inc. v. Boston Police Dept.,* 973 F.2d 18, 20 (1st Cir.1992) (issue is unfit for review if "claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all"); *W.R. Grace & Co. v. EPA,* 959 F.2d 360, 364–65 (1st Cir.1991).