January 15, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 90-1208
No. 92-1507

INTERSTATE COMMERCE COMMISSION,

Plaintiff, Appellee,

v.

HOLMES TRANSPORTATION, INC.,

Defendant, Appellee.

ROBERT C. HOLMES AND DOROTHY HOLMES,

TRUSTEES OF THE ALVIN R. HOLMES FUND,

ROBERT C. HOLMES, INDIVIDUALLY, AND J. ROBERT SEDER,

Intervenors, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Circuit Judge,

Bownes, Senior Circuit Judge,

and Cyr, Circuit Judge.

John Woodward, with whom Burton C. Chandler, Seder and Chandler,

Andrew Z. Schwartz, Michele A. Whitman and Foley, Hoag & Eliot were on

brief for intervenors-appellants.
Stuart B. Robbins for plaintiff, appellee.

Frank J. Weiner for defendant, appellee.

CYR, Circuit Judge. Robert C. Holmes, individually and
CYR, Circuit Judge.

as trustee of the Alvin R. Holmes Fund ("Holmes Trust"), and

Dorothy Holmes, as trustee of the Holmes Trust (hereinafter,

collectively, "Holmes parties"), appeal a district court order

directing the disbursement of an escrow fund established to

defray certain civil liabilities relating to their sale of Holmes

Transportation, Inc. ("HTI"), a corporation wholly owned by the

Holmes parties. The Holmes parties are joined on appeal by J.

Robert Seder, Esquire, a former escrow agent for the fund.

Appellate jurisdiction having been retained, and certain prelim-

inary matters having been resolved on remand, we proceed to the

merits and affirm the district court order.

I

BACKGROUND

First we describe the somewhat intricate context in

which the present litigation developed. The Holmes parties

entered into negotiations in 1988 to sell HTI to Route USA

Resources, Inc. ("Route USA"), a corporation wholly owned and

controlled by Manfred Ruhland. Throughout the negotiations,

Seder represented the Holmes parties, and Robert D. Gunderman,

Esquire, represented Ruhland and Route USA. Ruhland had assumed

control of HTI, and consummation of the sale of HTI to Route USA

appeared imminent, when the Interstate Commerce Commission

("ICC") initiated the present action against HTI on July 13,

3

1988, to recover $501,976 in refunds allegedly due HTI customers

for freight overpayments improperly withheld by HTI during the

period 1984-1988 ("ICC refunds").1

The ICC action threatened to derail the HTI sale, as

Ruhland demanded a reduction in the purchase price to offset

HTI's contingent liability on the ICC refund claims. In order

for the HTI sale to proceed, the Holmes parties agreed to escrow

$500,000 of Ruhland's purchase money deposit to defray the ICC

refund claims against HTI (the "private escrow agreement"). On

September 22, 1988, Seder executed the private escrow agreement

as "attorney in fact" for the Holmes parties; Ruhland executed it

in behalf of Route USA; Seder and Gunderman executed it as desig-

nated escrow agents under the private escrow agreement. With the

ICC refunds obstacle apparently resolved, Ruhland abandoned the

demand for a reduction in the HTI purchase price, and the Holmes

parties' sale of HTI's stock to Route USA was consummated without

further incident.

While the private escrow agreement was being negotiat-

ed, HTI proposed a settlement of the ICC refund claims. On

December 12, 1988, HTI, represented by Gunderman, consented to

the entry of a district court injunctive decree ("consent de-

cree") mandating, in pertinent part, that HTI establish an escrow

fund containing at least $502,000 with which all HTI customer

1The ICC complaint did not name the Holmes parties as defen-
dants, but alleged that HTI failed to process and refund 3,048
unidentified payments and 3,485 duplicate payments received from
shippers, in violation of 49 C.F.R. 1008.9(a) and 1008.9(b).

4

overpayments were to be refunded by December 31, 1988. For

reasons which remain unclear, neither the ICC nor the district

court had yet been apprised of the private escrow agreement

previously executed between the Holmes parties and Route USA.

Thus, the escrow account arrangements envisioned in the

December 12 consent decree varied in considerable detail from the

terms of the private escrow agreement between the Holmes parties

and Route USA.2 Their function was identical, however: to

establish and preserve a fund for defraying the ICC refunds

determined to be due HTI's overcharged customers in the present

action.

The Holmes parties were not parties to the present

action at the time the consent decree was entered. At the

instance of the ICC, however, the consent decree was executed by

Seder, who had represented the Holmes parties throughout the HTI

negotiations with Ruhland and Route USA. As Gunderman and HTI

(but not the ICC) were well aware, of course, Seder and Gunderman

2The private escrow agreement provided that (1) the refunds
were to be made by HTI in the first instance, and reimbursed by
the escrow fund in $25,000 increments upon certification by HTI;
(2) the escrowed funds were to remain the property of the Holmes
parties, and, if not disbursed by March 16, 1989, were to revert
to them; (3) the escrowed funds were to be used only to defray
obligations accruing prior to February 3, 1988 (the date Ruhland
assumed operational control of HTI); and (4) the escrow account
was to be deposited in a state-chartered financial institution.
The consent decree, on the other hand, provided that (1)
refund payments were to be made directly from the escrow account
to the overcharged shippers; (2) all refunds (whether originating
before or after February 3, 1988) were to be made from the escrow
account; (3) the escrow account was not to terminate until all
refunds were made; and only then were any undistributed funds to
revert to HTI; and (4) the escrow account was to be established
in a federally-chartered financial institution.

5

were the designated escrow agents under the private escrow fund.

No refunds were ever disbursed.

On July 14, 1989, Ruhland sold HTI to Anthony Mataraz-

zo. Matarazzo was notified of the ICC action against HTI, but

was informed by Gunderman that the ICC refund claims were "al-

ready taken care of" and that a $500,000 escrow account had been

set aside to defray the refunds. The Holmes parties had other

plans for the escrowed funds. On July 18, 1989, the Holmes

parties initiated a declaratory judgment action in Massachusetts

Superior Court, to recoup the funds deposited pursuant to the

private escrow agreement. Meanwhile, the ICC became aware that

the refunds required under the consent decree had not been

disbursed.

On September 14, 1989, the ICC convened a meeting of

persons associated with HTI and with the original lawsuit. At

the meeting, the ICC was informed of the Holmes parties' state

court lawsuit and was furnished for the first time with copies of

the private escrow agreement. Matarazzo, in behalf of HTI,

agreed to effect the overdue ICC refunds within 30 days, provided

Seder and Gunderman, as escrow agents, would release the escrowed

funds. Gunderman agreed. Seder declined, however, contending

that (1) the Holmes parties' obligations under the private escrow

agreement terminated on March 16, 1989, (2) Seder's signature had

not bound the Holmes parties to the consent decree, and (3) the

Holmes parties were therefore entitled to recover the funds in

escrow.

6

On October 13, 1989, the Holmes parties and Seder

intervened in the present action, demanding a judicial declara-

tion entitling the Holmes parties to the escrow funds. The ICC

countered with a civil contempt citation against Seder, Gunder-

man, Ruhland, Route USA, HTI, and Matarazzo. The ICC contended,

inter alia, that Seder and Gunderman, by their execution of the

consent decree, subjected the escrowed funds to the jurisdiction

of the district court for disposition in accordance with the

terms of the consent decree. The ICC further contended that

Gunderman and Seder, as escrow agents, failed to provide prudent

supervision relating to HTI's obligation to disburse the escrowed

funds in accordance with the terms of the consent decree. A

barrage of cross-claims and counterclaims ensued. On Decem-

ber 15, 1989, HTI filed a voluntary chapter 11 petition in the

District of New Jersey.

On January 26, 1990, after an evidentiary hearing, the

district court issued its findings of fact, and concluded, in

pertinent part, that (1) the consent decree and the private

escrow agreement were negotiated simultaneously as "synergistic"

documents intended to ensure funding of the ICC refunds antici-

pated under the consent decree; (2) the consent decree was

executed by Seder as attorney for the Holmes parties and as a

designated escrow agent under the private escrow agreement; and

(3) the consent decree was "the only operative document" defining

the legal obligations of Seder and Gunderman relating to dis-

bursements from the escrow fund. The district court rejected the

7

Holmes parties' claims to the escrow fund, and held HTI and Seder

in civil contempt for refusing to disburse the ICC refunds

pursuant to the consent decree.3 Seder and Gunderman were

replaced as escrow agents by Frank Weiner, an HTI attorney, who

was directed to disburse the ICC refunds by March 30, 1990. We

stayed disbursements pending appeal.

On April 1, 1992, following remand, see ICC v. Holmes

Transp., Inc., 931 F.2d 984 (1st Cir. 1991), the district court

vacated its contempt finding against Seder and Gunderman,4 but

reaffirmed its order directing disbursement of the ICC refunds

from the escrow fund in accordance with the terms of the consent

decree. Appellants now challenge the district court order

entered on remand.

II

DISCUSSION

3Gunderman's civil contempt was deemed purged by his earlier
agreement to transfer the escrow funds in accordance with the
consent decree.

4Since Seder's removal as escrow agent terminated whatever
interest he asserted as a declaratory judgment plaintiff, we
conclude that Seder lacks appellate standing. See United States

v. Little Joe Trawlers, Inc., 780 F.2d 158, 161 (1st Cir. 1986)

("[t]o have standing to appeal, an appellant ordinarily must have
been a party to the proceeding below, and have been aggrieved by
the order appealed from . . . . '[A]lthough a party may have an
appealable interest at the commencement of a suit, if that
interest has terminated before the entry of a judgment or decree
sought to be appealed from, he cannot appeal'"). Accordingly,
Seder's appeal of the original contempt finding (based, inter

alia, on the vagueness of the consent decree, see Fed. R. Civ. P.

65) has been mooted. Except as otherwise indicated, therefore,
we refer to the Holmes parties as appellants.

8

As they were not named in the consent decree or in the

underlying ICC action, appellants contend that the district court

lacked authority to subject them and the private escrow fund to

the terms of the consent decree. We disagree.

The thrust of their argument is that the private escrow

agreement and the district court consent decree contemplated

separate and unrelated funds from which the ICC refunds would be

disbursed: a "private escrow fund," established under the escrow

agreement and belonging to the Holmes parties, which lay beyond

the jurisdictional reach of the district court; and an "ICC

fund," established by the consent decree, which was within the

control of the court but imposed legal obligations only on HTI.

To the extent that the district court purportedly subjected their

privately-created fund to the consent decree, the Holmes parties

contend that it lacked jurisdiction and disregarded the express

terms of their private escrow agreement. To the extent that the

consent decree directed disbursements from the escrow fund

identified in the consent decree, the Holmes parties argue that

as nonparties to the underlying action they were not bound

by the terms of the consent decree. See Fed. R. Civ. P. 65(d)

(injunction "binding only upon the parties to the action, their

officers, agents, servants, employees, and attorneys, and upon

those persons in active concert or participation with them who

receive actual notice of the order by personal service or other-

wise"); G. & C. Merriam Co. v. Webster Dictionary Co., 639 F.2d

29, 35 (1st Cir. 1980) ("[t]o hold a nonparty bound by an injunc-

9

tion it is thus essential to prove either that the nonparty

participated in the contumacious act of a party or that the

nonparty was subject to the injunction because legally identified

with a party"). The determinative difficulty with appellants'

conclusion lies in its faulty premise that there were two

separate and unrelated funds.

After carefully reviewing the relationship of the

parties, as well as the circumstances surrounding the drafting of

the escrow agreement and the consent decree, and based on its

"intimate understanding of the history and circumstances of th[e

ICC] litigation," see United States v. Massachusetts, 890 F.2d

507, 510 (1st Cir. 1989), the district court determined that the

private escrow agreement and the consent decree were "synergistic

documents," negotiated simultaneously, which contemplated a

single escrow fund comprised of the HTI purchase monies

received by the Holmes parties from Ruhland to underwrite HTI's

contingent liability for any ICC refunds determined due in the

present action. See Chelsea Indus., Inc. v. Florence, 358 Mass.

50, 55-56, 260 N.E.2d 732 (1970) (if part of "same transaction,"

separate contracts may be read together as integrated agreement);

see also Gilmore v. Century Bank & Trust Co., 20 Mass. App. Ct.

49, 50, 477 N.E.2d 1069, 1073 (1985) (whether two instruments

derive from "same transaction" is question of fact for court, to

be determined by "such factors as simultaneity of execution,

identity of subject matter and parties, cross referencing, and

interdependency of provisions"). The district court found that

10

the Holmes parties, through Seder's execution of the December

1988 consent decree, authorized HTI to utilize their interest in

the escrowed funds to effectuate the intended purpose. As HTI is

a party to the present action, the district court properly held

that it possessed jurisdiction over any interest HTI retained in

the escrowed funds.

Since the district court ruling was based, quite

properly, on extrinsic evidence of the parties' intent, both as

concerns the private escrow agreement and the consent decree, see

Gilmore, 20 Mass. App. Ct. at 50, 477 N.E.2d at 1073; see also,

e.g., Brennan v. Carvel Corp., 929 F.2d 801, 808 (1st Cir. 1991)

(considering extrinsic evidence to elucidate ambiguous relation-

ship between parties' prior agreements), we review its findings

only for "clear error." See Gel Systems, Inc. v. Hyundai Eng'g.

& Constr. Co., 902 F.2d 1024, 1027 (1st Cir. 1990) ("clear error"

review where court utilizes extrinsic evidence, as well as

documents, to interpret parties' ambiguous contractual relation-

ship); cf. Navarro-Ayala v. Hernandez-Colon, 951 F.2d 1325, 1340,

1343 n.21 (1st Cir. 1991) ("ordinary contract principles" and

standards of review should be used to interpret "the scope of the

parties' original bargain" in public consent decree).

1. The "Single-Fund" Premise

We discern no error in the district court ruling that a

single fund was contemplated by the parties to the private escrow

agreement and the consent decree. The "single-escrow fund"

ruling was supportably based on the following findings: (1) the

11

parties to the private escrow agreement were aware of the impend-

ing injunctive decree and even made reference to it in the

private escrow agreement; (2) the purpose of the parties to the

private escrow agreement was to fund the ICC refunds determined

due by HTI in the present action; and (3) the consent decree

referring to but one escrow fund (and there being no evidence of

another fund) was signed by Gunderman and by Seder as repre-

sentative for the Holmes parties.5

Similarly, it is relevant that the ICC, envisioning a

single escrow account from which the freight refunds would be

made, requested that the injunctive decree be forwarded to Seder,

as the legal representative of the Holmes parties, providing

clear evidence that the ICC likewise recognized the obligation of

the Holmes parties to facilitate disbursement of the ICC re-

funds.6 The understanding of the parties, as well as their

5Moreover, since subsequent conduct of the parties to a
consent decree may aid the interpretation of its intended scope,
see Navarro-Ayala, 951 F.2d at 1353 (Cyr, J., concurring in

part), we likewise consider it significant that Ruhland repre-
sented to Matarazzo, during their negotiations for the second HTI
sale, that the ICC refunds were "taken care of" by the private
escrow fund. As owner of Route USA, the initial purchaser of HTI
from the Holmes parties, and as the source of the funds deposited
under the private escrow agreement, Ruhland clearly understood,
prior to the onset of the present dispute, that the function of
the private escrow agreement was to ensure the funding required
to implement the consent decree.

6Mr. Gunderman, an escrow agent, counsel to HTI, and the
person who submitted the consent decree for signature by Seder,
made the following representations to the court:

Mr. Robbins [an attorney for the ICC] alluded to nego-
tiations that took place while the agreement was being
finalized. I was the one that contacted Mr. Robbins,
told Mr. Robbins that I am reading the order, the order

12

conduct, plainly comports with the district court's view of the

private escrow agreement and the consent decree as "synergistic

documents" whose function was to enable payment of the ICC

refunds owed by HTI. Taken together, the evidence provides ample

support for the district court findings. Nor are its findings

impeached by the discrepancies in the documents to which appel-

lants point. Rather, these discrepancies give rise at most to

another plausible view of the evidence. "Where there are two

permissible views of the evidence, the factfinder's choice

between them cannot be clearly erroneous." Cumpiano v. Banco

Santander Puerto Rico, 902 F.2d 148, 152 (1st Cir. 1990) (quoting

Anderson v. City of Bessemer City, 470 U.S. 564, 573, 574 (19-

85)).7

calls for the creation of an escrow fund. I alerted
him to the fact that there was, in fact, an escrow fund
established, and did he want us to go through the
exercise of closing one and opening a new one. Mr.
Seder was clearly away aware of that [sic]. When the
order was finalized, Mr. Robbins was aware, I was
aware, and Mr. Seder was aware, that there was an
escrow fund called for in the order, and that the
private escrow fund, if you will, was intended to
comply with the Court's order. . . .

Thus, Gunderman's representations, as an officer of the court,
though not evidence per se, reinforced the district court's

determination that at least HTI, Ruhland, and the ICC envisioned
the private escrow fund as the sole source of funding for the ICC
refunds. Moreover, the district court finding that the Holmes
parties acquiesced in the consent decree implementing this under-
standing cannot be considered clear error in light of Seder's
execution of the consent decree in behalf of the Holmes parties
and as an escrow agent under the private escrow agreement.

7Most discrepancies between the documents, see supra note 2,

are reconciled by according the consent decree its due as a
mutual modification of the escrow agreement to effect their
common purpose, viz., to fund disbursement of the ICC refunds

13

pursuant to the district court decree. Indeed, Escrow Agreement
11, on which the Holmes parties rest their claim to the escrow-
ed funds, appears explicitly to anticipate voluntary modifica-

tions to its expiration date in light of a subsequent consent
decree; it provides that the parties' escrow obligations will
expire on "March 16, 1988, or such later date as the parties may

agree in order to complete the review and repayment of all

unidentified and duplicate payments."

14

2. Seder's Capacity

As countervailing evidence to the "single-escrow fund"

theory, and as a separate basis for their claim to the escrowed

funds, appellants contend that Seder did not sign the December 12

consent decree as their attorney, but rather as counsel to HTI.

Therefore, they contend, the consent decree among Ruhland, HTI

and the ICC did not bind them; rather, their rights and obliga-

tions continued to be governed by the private escrow agreement,

which expired March 16, 1989, by its own terms.

Their argument is unavailing. Regardless whether Seder

represented HTI or the Holmes parties, the district court finding

that the escrowed funds were specifically dedicated to the

settlement of HTI's contingent liabilities, and were uncondition-

ally intended for that purpose, meant that there could be no

entitlement to recoup the funds until the ICC refunds were paid.

See 30A C.J.S. Escrows 5(a) ("to constitute an instrument an

escrow, it must be deposited with the intention that it shall

take effect on the performance of an express condition or the

happening of a certain event . . . [T]he condition or event must

be one in fact which will prevent the operation of the instrument

until it is performed or occurs"); see also Childs v. Harbor

Lounge of Lynn, Inc., 255 N.E.2d 606, 608, 357 Mass. 33, 35

(1970).

In any event, the district court rejected the factual

premise for appellants' argument, holding instead that Seder had

executed the consent decree as counsel to the Holmes parties. As

15

the determination of an attorney-client relationship is a ques-

tion of fact, or, at most, a mixed question of law and fact, see

Industrial Banker of Massachusetts v. Reid, Murdoch & Co., 297

Mass. 119, 8 N.E.2d 19, 22 (1937) (attorney's authority to demand

release of attachment, following alleged verbal authorization by

owner of property, is "question of fact"); see also Pedersen v.

Leahy, 397 Mass. 689, 690, 493 N.E.2d 486, 487 (1986) (where

signature line of purchase agreement is ambiguous as to capacity

of signing party, signatory's agency relationship ordinarily

presents a question of fact), we review for "clear error."

Industrial Bankers, 8 N.E.2d at 22; see generally LoVuolo v.

Gunning, 925 F.2d 22, 25 (1st Cir. 1991) ("clear error" review of

mixed questions).

As the district court determined, Gunderman not

Seder represented HTI at the time the consent decree was

signed. Control of HTI had been transferred to Ruhland in

February 1988; Gunderman served as Ruhland's counsel and as

counsel to the company after that date. Seder, by contrast,

represented the Holmes parties, not HTI, throughout the negotia-

tions for the sale of HTI. There is no indication that Seder

entered an appearance for HTI, participated in negotiations with

the ICC, or rendered significant professional services to HTI in

connection with the ICC refund claims. Prior to that time, Seder

had never entered an appearance for HTI in the present litiga-

tion; never billed HTI for professional services in furtherance

of its settlement with ICC; and never rendered significant

16

professional services to HTI in connection with the ICC refund

claims.8 Furthermore, as the district court found, given his

inexperience with ICC rules and regulations, there was little

apparent reason for HTI to retain Seder in the present litiga-

tion.9

3. The Agency Question

Appellants further assert that even if Seder did sign

the consent decree in their behalf, he had not been vested with

the proper authority under Massachusetts law.

Although, under Massachusetts law, the "general powers"

of an attorney to represent a client do not entail the authority

either to settle a case, see Precious v. O'Rourke, 270 Mass. 305,

8Appellants contend that the material inquiry for purposes
of determining the significance of Seder's signature on the
consent decree is not Seder's actual role, but ICC's understand-
ing of his role, since Seder signed the decree at ICC's behest.
They argue that a September 14, 1988 letter, allegedly excluded
improperly by the district court, showed that the ICC understood
that Seder was acting in behalf of HTI, not the Holmes parties.
Our review of the September 14 letter persuades us that it is
ambiguous as concerns Seder's role in negotiating the consent
decree, and that its exclusion, even if erroneous, was harmless
error.

9Once again appellants point to contrary evidence, including
the letter adverted to above, see supra note 8, and the fact that

the consent decree contained no signature line for the Holmes
parties. Their arguments are not compelling. Above Gunderman's
signature on the consent decree appears the legend "Attorneys for
Defendant," which reasonably can be read to refer to the Gunder-
man law firm. Although Seder's signature appears below Gunder-
man's, the document does not clearly identify Seder's affiliation
with any particular party to the action. At best, the proffered

evidence is ambiguous, suggesting an alternative inference which
might reasonably be drawn, but not warranting reversal on "clear
error" review. See Cumpiano, 902 F.2d at 152 (quoting Anderson,

470 U.S. at 573-74).

17

170 N.E. 110 (1930), or to make substantial modifications to an

existing contract, cf. Torrao v. Cox, 26 Mass. App. Ct. 247, 525

N.E.2d 1349 (1988), the principal's consent to be bound may be

implied by showing the agent's actual or apparent authority to

act in the principal's behalf. An agent's actual authority to

bind his principal may be implied under Restatement (Second) of

Agency 43 in circumstances where the principal has acquiesced

in or adopted conduct by the agent which is reasonably considered

to encompass the authority to undertake the subject conduct on

the principal's behalf. See LaBonte v. White Constr. Co., 363

Mass. 41, 292 N.E.2d 352, 355 (1973) (superintendent of schools

held to be 'agent' of school district for purposes of receiving

plaintiff's statement of claim, where superintendent was familiar

with contract involved in litigation, and school district had

acquiesced in superintendent's acceptance of other plaintiffs'

claims on several prior occasions); Hurley v. Ornsteen, 311 Mass.

477, 42 N.E.2d 273 (1942) (existence of agency relationship may

be implied from "course of conduct showing that a principal has

repeatedly acquiesced therein and adopted acts of the same

kind"); Restatement (Second) Agency 43. In light of its

finding that the private escrow agreement and the consent decree

were "symbiotic" documents designed to serve the identical

function, viz., providing an indemnity fund for settling the ICC

refund claims against HTI, the court supportably ruled that

Seder's authority to negotiate and execute the escrow agreement

in behalf of the Holmes parties implied the authority to modify

18

the escrow agreement as necessary to implement settlement of the

ICC refund claims in litigation.10 After carefully reviewing

the entire record, we find the force of the countervailing

evidence proffered by appellants insufficient to produce a

"definite and firm conviction that a mistake has been committed,"

Anderson, 470 U.S. at 573 (stating "clear error" standard of

review).11

10Implied authority might also be found under Restatement
(Second) of Agency 35 (1958), which provides that "unless
otherwise agreed, authority to conduct a transaction includes
authority to do acts which are incidental to it, usually accompa-
ny it, or are reasonably necessary to accomplish it." (Emphasis

added.) See also, e.g., Transurface Carriers, Inc. v. Ford Motor

Co., 738 F.2d 42, 45 (1st Cir. 1984) ("the law of principal and

agent is clear that conferring authority to conduct a transaction
gives authority to undertake acts incidental to the transaction")
(citing Massachusetts cases).
Gordon v. O'Brien, 320 Mass. 739, 71 N.E.2d 221 (1947),

cited by appellants, is not to the contrary. In Gordon, the

Supreme Judicial Court held that general authority to sell a
property on a client's behalf could not be presumed from the fact
that the parties' longtime attorney had sold another, unrelated

property to a different party in a prior transaction. 320 Mass.
at 741. Here, the district court reasonably inferred that Seder
was authorized to sign the consent decree, based on the fact that
Seder had signed a closely related document, the private escrow

agreement, essentially involving the same parties and the same
fund. The present case is closer to United States v. Bosurgi,

343 F. Supp. 815, 817 (S.D.N.Y. 1972), aff'd in pertinent part,

530 F.2d 1105 (2d Cir. 1976), cited by neither party, in which an
attorney, expressly retained to defend a lawsuit involving an
escrow fund, was held to possess implied authority to receive
process on the same client's behalf in separate litigation
involving the same fund.

11Since we affirm on the strength of the district court's
ruling that Seder possessed implied authority to bind the Holmes
parties, we need not reach its alternative holding, based on
"apparent authority."

19

III

CONCLUSION

The district court did not exceed its authority by

directing disbursements to the ICC refund claimants from the

escrow fund established under the private escrow agreement. As

the escrow fund was comprised of the monies Ruhland deposited

with the Holmes parties for the purchase of HTI, and their

private escrow agreement was specifically intended as an indemni-

ty fund for settling HTI's contingent liabilities to the ICC

refund claimants in the present litigation, the district court

possessed jurisdiction over the escrow fund incident to its

jurisdiction over HTI in the underlying ICC action.

The district court order is affirmed, with costs to

appellees. The order previously entered by this court, staying

further disbursements from the escrow account, is vacated. The

case is remanded to the district court for further proceedings

consistent herewith.12

12Since neither party has demonstrated the likelihood of a
residue in the escrow account following disbursements to the ICC
refund claimants, any dispute over a residue is unripe for
decision. See Massachusetts Ass'n of Afro-American Police, Inc.

v. Boston Police Dept., 973 F.2d 18, 20 (1st Cir. 1992) (issue is

unfit for review if "claim involves uncertain and contingent
events that may not occur as anticipated, or indeed may not occur
at all"); W.R. Grace & Co. v. EPA, 959 F.2d 360, 364-65 (1st Cir.

1991).

20